UTICA NATIONAL BANK AND TRUST
COMPANY, Appellant,

v.

ASSOCIATED PRODUCERS
COMPANY, Appellee.

No. 50731.

Supreme Court of Oklahoma.

Nov. 12, 1980.

Rehearing Denied Feb. 9, 1981.

Doerner, Stuart, Saunders, Daniel & Langenkamp by Dallas E. Ferguson, Tulsa, for appellant.

Howard & Rapp by W. Keith Rapp, Tulsa, for appellee.

OPALA, Justice:

The issues to be resolved are twofold: [1] Did the trial court err in ruling that the secured creditor did not have a perfected security interest in funds collected by the debtor's broker because these funds constituted "contract rights" rather than "accounts' proceeds"? [2] If the secured creditor is to be deemed to have a perfected interest in the proceeds of accounts, is the broker entitled to credit for payments advanced on invoices which are in excess of the amount collected after due adjustments had been allowed?

We hold that (a) the funds collected by the broker from the debtor's customers are to be treated as accounts' proceeds because debtor's right to payment had already been earned by performance, (b) the broker is to be treated as a collection agent for the debtor, (c) the broker's rights *vis-à-vis* the debtor's secured creditor are to be measured by the principles applicable at common law to an agency relationship between the debtor and the broker and (d) the broker, *qua* agent, must be allowed credit for funds advanced in excess of the amounts collected after proper adjustments.

By its October 1974 contract with Lamb Coal Company [Lamb], Associated Producers Company [Broker], in consideration of an advance loan of $30,000, received first-sale rights in coal mined by Lamb. The Broker was to receive a commission on sales and was to be repaid its loan by deducting, from customers' payments, $1.25 for each ton shipped. The contract was silent about both the coal price and the mode of payment. After commencing mining operations in Kansas, Lamb soon followed with shipments of coal to customers found by its Broker.

In December 1974 Lamb assigned all of its accounts and proceeds to Utica National Bank and Trust Company [Bank] as collat-

eral for a series of loans. The Bank perfected its security interest by filing a financing statement both with the Secretary of State in Kansas and the Register of Deeds in the county of Lamb's operations. Lamb then notified Broker to forward to the Bank all payments received from Lamb's customers. The Broker proceeded to comply with these instructions.

Although the Lamb/Broker contract did not address what procedure was to be followed in effecting the Broker's first-sale rights, the parties began shaping their business conduct according to a certain pattern. Upon receipt of purchase order from a customer found by the Broker, Lamb would ship the coal directly to the customer, but would send the invoice to the Broker who in turn billed the customer. The Broker paid the invoices so received twice monthly regardless of whether he had received payment from the buyer. On a few occasions coal purchasers would impose a "penalty" (price discount reduction) when the BTU content of the coal shipped was found to be too low. This meant that the Broker would receive less than the invoice price after having already remitted the full amount to Lamb. These overpayments came to be described by the Broker as "unwitting advances". It is the Broker's position that it may recoup these overpayments out of any funds collected from customers, regardless of whether the funds came from the very customer who had exacted a "penalty". The Bank contends the Broker is not entitled to credit for payments in excess of collections actually received from customers after due adjustments.

Upon Lamb's default the Bank sued the Broker to recover the claimed collateral and for an accounting for all funds collected. The Bank moved for summary judgment, alleging its perfected security interest in accounts had priority over the Broker's claim to these funds. The trial court granted summary judgment in favor of the Broker based on a determination that the funds collected by the Broker were "contract rights" and the Bank's assignment of accounts was subject to claims and defenses arising out of the contract between Lamb and the Broker.

The Bank appeals from a summary judgment against it.

■ Was the trial court in error in finding that the funds collected by the Broker from Lamb's customers were contract rights and not proceeds of accounts? First, a choice of law problem must be resolved.[1] The terms of 12A O.S. 1971 § 9–103(1) govern the choice of law in multistate transactions dealing with accounts or contract rights.[2] The location of the office where the assignor of accounts or contract rights keeps his records concerning them controls the choice of law issue. The debtor-assignor [Lamb] of accounts in our case kept its records in Kansas until July 1975 when it moved to Texas. The law of the state where collateral is located at the time of the secured transactions is the governing law without regard to possible contacts in other jurisdictions. This is the prevailing view.[3] We adopt it here. The loans occurred from December 1974 until June 1975; therefore, Kansas law shall govern

1. The question may be considered purely academic because both Oklahoma and Kansas adopted the 1962 U.C.C. version which was in effect when the transactions in question occurred.

2. The terms of Kan.Stat.Supp. 1965 § 84–9–103(1) provide: "(1) If the office where the assignor of accounts or contract rights keeps his records concerning them is in this state, the validity and perfection of a security interest therein and the possibility and effect of proper filing is governed by this article; otherwise by

the law (including the conflict of laws rules) of the jurisdiction where such office is located." In 1975 this section was amended to conform to the 1972 version of the Uniform Commercial Code. It became effective January 1976. Kan. Sess.L. 1975, c. 514 § 6 at 1666–1704. *This case is hence governed by the pre-1975 version of the Kansas law.*

3. *United States v. Ed Lusk Construction Co., Inc.,* 504 F.2d 328, 330 [10th Cir. 1974]; *First National Bank and Trust Co. of Vinita v. Atlas Credit Corp.,* 417 F.2d 1081, 1082 [10th Cir. 1969]; *American East India Corp. v. Ideal Shoe*

the validity and perfection of the security interest and rights of third parties *vis-à-vis* the secured creditor.[4]

## I.

### WERE THE FUNDS COLLECTED "CONTRACT RIGHTS" OR "PROCEEDS OF ACCOUNTS"?

An "account" is defined as any right to payment for goods sold—a right earned by performance regardless of whether payment be due.[5] A "contract right", as distinguished from an account, is "any right to payment under a contract not yet earned by performance."[6] Contract rights may be regarded as "potential accounts" which ripen into accounts by an effected performance.[7]

■ In all instances here under review the coal had been shipped to the customer pursuant to a purchase order. Performance of the contract took place when the goods were received. Thus the right to payment—once having been earned by contract performance—operates to transform a contract right into an account.[8]

In the view of the trial court, the contract was not complete and the right to payment nonetheless remained a contract right until the customer had determined the BTU content of the coal. This is so because the price for the coal shipped was subject to adjustment and hence uncertainty until the customer had determined the BTU content of the coal received. According to the trial court, the Bank's security applied only to accounts and proceeds thereof and did not attach to the credits claimed by the Broker.

Broker contends here that only where all identifiable contingent claims which can be asserted against a contract right have been extinguished does the contract right ripen into an accounts receivable. It argues that in order for the contract right to be extinguished not only must the BTU content be determined but also (a) negotiations with respect to the BTU penalties must be completed, (b) monies must be received from the customer and (c) offsets must have been deducted for its overpayments to Lamb.

■ We cannot accede to the Broker's view. The Code allows for open-ended price term contracts to be binding and conclusive agreements even though the price is unsettled.[9] The uncertainty of the price of goods shipped does not alter the fact that performance was complete and the right to payment had been earned. It is performance rather than calculations of an exact price which is the key factor in determining when an account comes into legal existence. The fact that a customer or a third party may have a defense to the payment in full of that claim, or a contingent claim by way of setoff, does not prevent an account from coming into existence upon the seller's performance. We therefore hold that funds collected by the Broker from Lamb's customers were proceeds of accounts within the meaning of the Code.

## II.

### THE NATURE OF THE SECURED CREDITOR'S CLAIM AGAINST THE DEBTOR'S BROKER

■ Perfection of the Bank's security interest continued in force after Lamb had

---

Co., 400 F.Supp. 141 [E.D.Pa.1975] aff'd 568 F.2d 768 [3rd Cir. 1978]; 2 Gilmore, Security Interests in Personal Property § 44.11 at 1280 [1965]. *Cf. Skinner v. Taber Foreign Motors, Inc.*, 345 Mass. 429, 187 N.E.2d 669 [1963].

4. Kan.Stat.Supp. 1965 § 84–9–103. While Kansas has adopted the 1972 amendments to the Code, we do not apply them here. This is because the facts in this case all happened before the Kansas amendments became effective. *Accord*: 1 Gilmore, Security Interests in Personal Property § 10.9 at 321. *Cf.* 1 Coogan, Hagan and Vogts, Secured Transactions under Uniform Commercial Code §§ 5B.03 and 5B.04(1) and Weintraub, Choice of Law in Se-

cured Personal Property Transactions: The Impact of Article 9 of U.C.C., 68 Mich.L.R. 683, 697 [1970].

5. Kan.Stat.Supp. 1965 § 84–9–106.

6. Kan.Stat.Supp. 1965 § 84–9–106.

7. Official U.C.C. comments, § 9–106.

8. Official U.C.C. comments, § 9–106.

9. Kan.Stat.Supp. 1965 § 84–2–305.

moved its records to Texas. This is so because the Bank properly filed in that state.[10] The Broker perfected no security interest in Lamb's accounts' proceeds or in Lamb's inventory to secure its loan to Lamb made pursuant to the October 1974 contract.

The Broker's claim to priority in the funds is based on its asserted status as Lamb's "account debtor." The trial court, following the provisions of § 9–318(1)(a),[11] determined that the Bank's interest in the accounts' proceeds was subject to all claims and defenses arising out of the Lamb/Broker contract.

■ An "account debtor" is defined as "the person who is obligated on an account, chattel paper, contract right or general intangible."[12] Where the collateral is an account, contract right, chattel paper or general intangible, the original obligor is called the "account debtor".[13] Here the Broker was neither obligated to buy the coal nor obligated on the purchase order.

The purchase order represented a contract for sale between Lamb and another. It did not include the Broker as a party. The status of the Broker was clearly not that of an account debtor *nor that of any other kind of debtor in the common-law and U.C.C. sense.*[14]

Stripped of all the excess verbiage, the Broker simply seeks here credit for the difference between money remitted on invoices and the amount collected after BTU adjustments had been made. In collecting the funds and advancing payments the Broker was acting as a common-law agent.[15] The rights between Lamb and the Broker, *inter se*, are not governed by the Code but rather by the principles of common-law agency.[16]

■ If this action had been one for equitable accounting between Lamb and the Broker, there would be no doubt about the correctness of the Broker's position. The allowance sought for "advanced" payments (in excess of collections) would be a proper offset.[17] Were we not to allow the

---

10. 3 Tex.Bus. & C.Code § 9.401(a)(3).

11. The terms of Kan.Stat.Supp. 1965 § 84–9–318(1) provide: "(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 84–9–206 the rights of an assignee are subject to [a] all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and [b] any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment." The trial court, in its ruling on motion for summary judgment, referred to 12A O.S. 1971 § 9–318(1) whose terms are identical to the Kansas statute cited above.

12. Kan.Stat.Supp. 1965 § 84–9–105(1)(a).

13. Official U.C.C. Comment No. 2, § 9–105.

14. A "debtor" is defined by the U.C.C. in § 9–105(1)(d) as "... the person who owes payment or other performance of the obligation secured ... * * *." A "debt" in the common-law sense is "a sum of money due by certain and expressed agreement. It originates in and is founded upon contracts express or implied." *Shultz v. Ritterbusch,* 38 Okl. 478, 134 P. 961,

968 [1913]. *The obligation between principal and agent is not a debt in the common-law sense but a right in equity to an accounting. Cline v. McKee,* 186 Okl. 366, 98 P.2d 25, 27 [1940]. For the distinction between attributes of a debtor/creditor and principal/agent relationship see *McFarling v. Demco, Inc.,* Okl., 546 P.2d 625, 628 [1976].

15. In a principal-and-agent relationship all funds collected for the principal, minus proper deductions due the agent, remain, at all times, in the constructive possession of the principal. There can be no "debt" between them in the common-law sense. The money in the hands of the agent always "belongs" to the principal. *McFarling v. Demco, Inc.,* supra note 14.

16. The terms of Kan.Stat.Supp. 1965 § 84–1–103 provide in pertinent part: "Unless displaced by the particular provisions of this act, the principles of law and *equity* ... and the law relative to ... *principal and agent* ... shall supplement its provision." [emphasis added].

17. *Field v. Spencer,* 176 Okl. 57, 54 P.2d 146 [1936] (syllabus 3 by the court). The principal's remedy against the agent for a fiduciary accounting is one of purely equitable cognizance and is controlled by the established prin-

Broker the same benefit in this action by Lamb's creditor, we would be, in effect giving the assignee-Bank a greater right in the proceeds than that which Lamb could have asserted for itself. The absurdity of this result is at once apparent. The Bank can have no greater right in the accounts' proceeds than its assignor-Lamb.[18] If the law were otherwise, the Bank—*qua* secured creditor—could create for itself rights in proceeds its very own assignor would be powerless to harness.

The Broker, in its capacity as an agent, was liable to Lamb for no more than the proceeds collected less, of course, the sales commission.[19] The Bank, having no greater right in the proceeds than Lamb, can claim no interest in excess of the total funds collected less proper credits. We need not reach for decision the issue of whether the Bank could assert priority over the Broker's claim to the $1.25 tonnage fee. By the Lamb/Broker contract that fee was to be used for repayment of the Broker's start-up loan. The Bank simply lays no claim to a priority in that fee.[20]

While the reasons given by the trial court for its ruling were incorrect, the judgment is free from error.

Affirmed.

All Justices concur.

---

ciples of equity. *Gulf Coast Western Oil Co. v. Trapp,* 165 F.2d 343 [10th Cir. 1948]; *Cline v. McKee,* supra note 14.

18. *National Bank of Commerce of Tulsa v. ABC Const. Co.,* Okl., 442 P.2d 269 [1966]; *Tennant v. Dodsworth,* Okl., 349 P.2d 9 [1960]; *Fourth National Bank of Tulsa v. Cochran,* Okl., 298 P.2d 784 [1956].

19. *Field v. Spencer,* supra note 17.

20. By a consistent course of conduct, admitted in the briefs, the Bank had relinquished its claim to a security interest in that portion of the funds. Kan.Stat.Supp. 1965 § 84–1–205(1).