Richard L. WAGGONER and Lois A. Waggoner, Appellees,

v.

TOWN & COUNTRY MOBILE HOMES, INC., a subsidiary of Brigadier Industries Corp., an Oklahoma corporation, a subsidiary of U.S. Homes Manufactured Housing Corp., a New Jersey corporation, and University Mobile Homes, Inc., an Oklahoma corporation, et al., Appellant,

and

University Mobile Homes, Inc., Appellee.

No. 64507.

Supreme Court of Oklahoma.

Dec. 27, 1990.

Rehearing Denied April 2, 1991.

Murphy & Murphy by Robert M. Murphy, Jr., Stillwater, for appellant.

Melissa Griner DeLacerda, Stillwater, for appellees, Waggoners.

Winfrey D. Houston, Stillwater, for appellee, University Mobile Homes, Inc.

HODGES, Judge.

This appeal presents an issue of first impression. Did the trial court err by instructing the jury on manufacturers' products liability when a design defect caused only deterioration in the product itself resulting in purely economic loss? We answer in the affirmative and hold that such a claim must be pursued as a warranty action.

There is a second issue. Did the trial court err by denying manufacturer's motion for a directed verdict on dealer's claim of malicious interference with a business relationship? We answer in the affirmative.

On June 26, 1979, Richard and Lois Waggoner (consumers) purchased a mobile home from University Mobile Homes, Inc. (dealer). Consumers chose a model manufactured by Town and Country Mobile Homes, Inc. (manufacturer), which consumers considered to be one of the "Cadillac" mobile homes. Their decision to purchase followed a visit to the factory in Texas where they talked to a representative about an energy package and other options which they eventually chose. The total purchase price was $22,850.

The first winter consumers spent in the home brought hints of problems to come. There was a rumbling noise in the roof when the wind blew and minor spotting on the ceiling tiles which consumers attributed to a leaking roof. Consumers repaired the ceiling tiles. Manufacturer installed metal "rumble strips" which were screwed to the metal roof along the length of the mobile home.

The second winter (1980–1981), the minor spotting returned. Consumers again treated the ceiling tiles with bleach and "a little white shoe polish" and again they attributed the spots to leaks in the roof. They believed the screws securing the rumble strips had caused some additional leaking. To cure this, they applied a cool-coat sealant to the roof.

When the spotting returned the third winter (1981–1982), consumers realized that leaks were not the cause of the problem. They consulted dealer who informed them that other Town and Country homes with the energy package had been experiencing similar problems. Dealer wrote to manufacturer in January, 1982, outlining these complaints.

The actual cause of the ceiling spots was the design of the home's roof which did not allow interior moisture to escape. Once outside temperatures fell below the dew point, condensation collected in the attic and dripped back, spotting the ceiling tiles.

Manufacturer responded to consumers' complaint by installing two power vents to pull air out through the roof of the mobile home to prevent condensation. Manufacturer also hired a repairman to paint the ceiling and seal the roof with cool-coat and membrane cloth.

Unfortunately, the power vents did not prevent the return of the ceiling spots the next winter (1982–1983). Manufacturer told consumers that the home might have to be moved to the factory to have a house-type roof installed. But instead, manufacturer attempted to cure the problem by removing the power vents and installing two "thinking caps." As with the power vents, consumers were assured that the thinking caps would solve the problem.

Each thinking cap consisted of a motorized ventilator mounted through a hole in the roof. The caps were thermostatically controlled to draw air out of the attic. Six interior vents were cut in the ceiling of consumers' home. In theory, moist air was to be drawn from the living quarters, through the attic, and out through the caps on the roof. In reality, the system drew even more moisture into the attic. The moisture condensed before it could be drawn out through the roof.

As a result, the next winter (1983–1984) brought the worst condensation consumers had experienced. Water actually dripped from one of the vents in the ceiling. Consumers decided they could not endure any further "cures". They filed their petition on January 25, 1984.

Both dealer and manufacturer were named as defendants. Consumers sought $30,000 actual damages, as the replacement cost of the home, alleging a design defect and a breach of the express and implied warranties of "habitability" and "proper workmanship." They also sought $50,000 in punitive damages for "misrepresentations ... suffering and harrassment" resulting from failures in attempting to remedy the condensation. Manufacturer cross-petitioned, seeking contribution from dealer for any damages awarded to consumers. Dealer also cross-petitioned, seeking $100,000 actual damages and $100,000 punitive damages for malicious interference with a business relationship.

At trial, the jury was instructed solely upon manufacturers' products liability as

to consumers' claim. The jury awarded consumers $22,800 actual damages and $7,200 exemplary damages against manufacturer. Manufacturer failed in its contribution claim against dealer, but dealer was awarded $5,000 actual damages against manufacturer for interference with its business relationships. Addressing only the products liability issue, the Court of Appeals affirmed the awards.

## I.

A product can cause personal injury, property damage, and economic loss. Recovery, under the doctrine of manufacturers' products liability, is allowed for personal injury, *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okla.1974), and damage to property other than damage to the product itself, *Kimbrell v. Zenith Radio Corp.*, 555 P.2d 590 (Okla.1976) (television set alleged to have caused extensive fire damage to plaintiff's home). This Court has yet to address the question of whether manufacturers' products liability applies to purely economic damages resulting from product deterioration. The question is one of the proper relationship between the Uniform Commercial Code (UCC) and manufacturers' products liability.

An action in manufacturers' products liability is "primarily tortious in nature." *Kirkland*, 521 P.2d at 1361. Its rationale "is founded upon public interest in human safety." *Id.* at 1362. "[A] plaintiff who has suffered damages by reason of a defectively manufactured article may recover under the doctrine of Manufacturers' Product Liability all of the damages which were the reasonable consequences of the defective article to the same extent as if the plaintiff's action was based upon negligence." *Moss v. Polyco, Inc.*, 522 P.2d 622, 626 (Okla.1974). This liability is independent of UCC warranty provisions because recovery under manufacturers' products liability arises from a duty to the public rather than from a contractual relationship. *Kirkland*, 521 P.2d at 1362 (quoting Restatement (Second) of Torts

§ 402A, comment m). Thus, the parties to a sales contract may not limit a manufacturer's liability for personal injury caused by a product defect. *See Moss*, 522 P.2d at 627. *See also* Okla.Stat. tit. 12A, § 2–719(3) (1981).

Recovery under warranty provisions, however, applies to losses flowing from the sales contract. *Moss*, 522 P.2d at 625–26. Comment 4 to section 2–313 of the UCC notes that "the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell." Section 2–314 provides that "[u]nless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." This warranty extends to a buyer's family, household, and guests under section 2–318. The ultimate consumer may maintain an action against both the retailer and the manufacturer to recover the benefit of the bargain. *See Old Albany Estates, Ltd. v. Highland Carpet Mills, Inc.*, 604 P.2d 849 (Okla. 1979).

As to damages recoverable in a warranty action, section 2–714 of the UCC provides in part:

> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Consequential damages are defined in section 2–715(2)(b) to include "injury to person or property resulting from any breach of warranty."

Thus, as to personal injury or injury to other property, manufacturers' products liability and the UCC warranty provisions provide parallel remedies.[1] But as to dam-

---

1. In this regard a mobile home has been regarded as "goods" under the UCC and a "product" for manufacturers' products liability under Oklahoma law. In cases involving economic

age only to the product itself, the two remedies dramatically diverge.

■ This Court has long held that manufacturers' products liability should be distinguished from contractual liability. "While the UCC does envision allowing recovery for personal injury and for property damage arising out of defectively manufactured articles, such recovery arises out of ·contractual relationships, express or implied...." *Moss*, 522 P.2d at 625 (citations omitted). This contractual relationship, the sales contract, is also the basis for the recovery of a buyer's economic losses.

In contrast, "[t]he economic expectations of parties have not traditionally been protected by the law concerning unintentional torts." *Clark v. International Harvester Co.*, 99 Idaho 326, 335, 581 P.2d 784, 793 (1978). These expectations have been safeguarded by commercial law principles. Therefore, economic damages are more logically related to the UCC than to manufacturers' products liability.

There is no need to extend manufacturers' product liability into an area already occupied by the UCC. To extend manufacturers' products liability to include purely economic losses would undermine the UCC's "comprehensive and finely tuned statutory mechanism for dealing with the rights of parties to a sales transaction with respect to economic losses." *Id.* 581 P.2d at 792. The judicial adoption of manufacturers' products liability in Oklahoma was never intended to replace the statutory provisions of the UCC. Its adoption signaled the end of warranty defenses, such as lack of privity and warranty disclaimers, when a product causes personal injury or damage to other property. But when purely economic losses are caused by a product, the economic expectations of the buyer are protected by the UCC.

The United States Supreme Court reached this same conclusion in an admiralty context in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). There, a unanimous Court adopted the position of the majority of courts and held that purely economic losses are not recoverable in products liability. The Court noted that protection of the buyers' expectations as to product value "is precisely the purpose of express and implied warranties." *Id.* at 872, 106 S.Ct. at 2303. We adopt this reasoning and hold that in Oklahoma no action lies in manufacturers' products liability for injury only to the product itself resulting in purely economic loss.

■ The facts of this case involve only economic loss and disappointment associated with manufacturer's unsuccessful attempts to remedy condensation within consumers' mobile home. No personal injury or damage to other property occurred. Damage was limited to the product itself. Therefore, any recovery must be based upon the contractual relationship, specifically the warranty provisions, express or implied.

■ This case was tried under the wrong theory of recovery and punitive damages were assessed in what should have been a contract action. Although manufacturer's inability to repair the mobile home is relevant to the effect of the remedy limitation provision of the limited warranty, *see Osburn*, 613 P.2d at 449–50, it does not provide an independent tort upon which to base punitive damages. Such error cannot be considered "harmless". The erroneous submission of the case to the jury on a manufacturers' products liability theory deprived manufacturer of its warranty defenses under the UCC. The case must be remanded for application of the UCC warranty provisions.

loss, with no personal injury or injury to other property, a mobile home has been treated as "goods". *See Osburn v. Bendix Home Sys., Inc.*, 613 P.2d 445, 448 (Okla.1980) ("A mobile home falls clearly within the definition of 'goods' found in § 2–105."); *Cochran v. Buddy Spencer Mobile Homes, Inc.*, 618 ᵽ.2d 947, 950 (Okla.Ct. App.1980) ("A mobile home is a 'good' as de-fined in section 2–105(1)."). A mobile home has been treated as a "product" only when personal injury occurred. *See Dewberry v. LaFollette*, 598 P.2d 241 (Okla.1979) (lessor who placed mobile home into stream of commerce was answerable in manufacturers' products liability for personal injuries sustained when access steps to home collapsed).

## II.

Manufacturer also seeks review of the trial court's overruling of its motion for a directed verdict, at the close of dealer's evidence, on dealer's claim for malicious interference with its business relationships. The Court of Appeals opinion indicates that court simply found no merit to this assignment of error.

Dealer's action was for damage to its business reputation and a substantial reduction in sales caused by the ill will and adverse publicity resulting from "[t]he refusal of Town and Country Mobile Homes, Inc., in performing under its written warranties." Dealer claimed the "neglect and procrastination" associated with manufacturer's failure to remedy the condensation problem in consumers' home and three other mobile homes constituted a malicious interference with its business.

In Oklahoma, "one has the right to carry on and prosecute a lawful business in which he is engaged without unlawful molestation or unjustified interference from any person, and any malicious interference with such business is an unlawful act and an actionable wrong." *Crystal Gas Co. v. Oklahoma Natural Gas Co.*, 529 P.2d 987, 989 (Okla.1974). To recover damages for the tort of malicious interference with a business relationship, "a plaintiff must show: 1. That he or she had a business or contractual right that was interfered with. 2. That the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable. 3. That damage was proximately sustained as a result of the complained interference." *Mac Adjustment, Inc. v. Property Loss Research Bureau*, 595 P.2d 427, 428 (Okla. 1979).

The tort was first recognized in Oklahoma in the context of malicious interference with the contractual rights of a business in *Schonwald v. Ragains*, 32 Okl. 223, 122 P. 203 (1912). That decision defined the element of "malice", for malicious interference, as "an unreasonable and wrongful act done intentionally, without just cause or excuse." *Id.* at 240, 122 P. at 210.

The evidence in this matter did not demonstrate an intentional act of interference with dealer's business. Although dealer may have suffered reduced sales from manufacturer's futile attempts to remedy condensation within consumers' mobile home, no evidence was presented to indicate that manufacturer intended to harm dealer's reputation or sales. In fact, any harm to dealer's sales must also have harmed the sales of manufacturer who supplied the mobile homes.

Manufacturer was acting to fulfill its obligations under the sales contract by attempting to repair consumers' mobile home. These attempts cannot be considered wrongful acts even though the results were poor. To hold a manufacturer liable in tort for failing to adequately remedy product problems would discourage manufacturers from performing repairs pursuant to sales contracts.

Manufacturer's motion for a directed verdict on dealer's claim should have been granted and consumers' action should have been tried under a warranty theory. On remand, the trial court shall enter judgment for manufacturer on dealer's claim for malicious interference and consumers' claim will be pursued under a warranty theory.

COURT OF APPEALS OPINION VACATED; JUDGMENT OF TRIAL COURT REVERSED; CAUSE REMANDED WITH INSTRUCTIONS.

HARGRAVE, C.J., and LAVENDER, SIMMS and SUMMERS, JJ., concur.

OPALA, V.C.J., concurs in part, dissents in part.

DOOLIN, ALMA WILSON and KAUGER, JJ., dissent.

OPALA, Vice Chief Justice, with whom KAUGER, Justice, joins, concurring in part and dissenting in part.

The court reverses the judgment on jury verdict for the plaintiffs in a tort action for damages from a mobile home's structural design defect which had caused excessive moisture condensation above the ceiling.

The trial court had instructed the jury on the theory of strict (or manufacturers' products) liability alone. According to the court's opinion, which remands the plaintiffs' case for a new trial, the claim should have been "pursued as a warranty action." In essence, the court holds that when a defective product causes "purely economic losses" but no personal injury, the manufacturer *must* be afforded the opportunity to assert the "warranty defenses" provided by the Uniform Commercial Code (UCC).

I cannot accede to today's pronouncement. In my view, the court need not now decide whether manufacturers' products liability may be imposed in the absence of bodily injury. Whatever error the trial court might have committed by instructing the jury on a single theory of liability is *harmless* because record proof of fraud or gross negligence overwhelmingly supports the verdict. Plaintiffs' judgment against the manufacturer should hence be affirmed.

I concur in that portion of the court's opinion which reverses the judgment on jury verdict rendered for the mobile home dealer on its cross-claim against the manufacturer for "malicious interference with business relations." There is no evidence of manufacturer's malice *vis-a-vis* the dealer, and the verdict cannot be sustained on any other theory of recovery.

The plaintiffs' case, submitted to the triers on strict liability theory, resulted in judgment on jury verdict against the manufacturer (appellant) for actual as well as for punitive damages. Because the harm for which suit was brought affected only the *res*—the article itself—and no relief was sought for injury to a person, the manufacturer argues that strict liability theory (also known in Oklahoma as manufacturers' products liability) is inapplicable to this case. The court agrees and holds the UCC provides adequate relief.[1]

Assuming that in law a mobile home does, as the court holds today, come under the rubric of goods, there is nothing in the UCC's warranty provisions which abrogates common-law remedies for damages from a product's design defect.[2] Legislative creation of a statutory remedy, *without the express repeal of the pre-existing common law,* cannot give rise to an exclusive remedy.[3]

Proof admitted at trial establishes not only manufacturer's negligence in designing the product, but also its fraud and gross negligence. There is here ample evidence of the manufacturer's obstructive behavior and reckless indifference to the safety of the habitational structure in contest as well as to the plaintiffs' legitimate demands for corrective action.[4] An appel-

---

1. The court's opinion notes that manufacturers' products liability, as a theory of recovery, is founded upon the public's interest in human safety. In my view, the recovery plaintiffs seek in this case is as affected by considerations of *human safety* as it would be if they were suing for bodily injury. Here, we are dealing with the *quality of habitation. When the producer knows or should have known that its mobile home is unfit for use as a place of human habitation, this state's public policy should equally condemn the product's manufacture and its placement into the stream of commerce as it would if bodily injury had occurred.*

2. Legislative intent to change the common law must never be presumed from an ambiguous, doubtful or inconclusive text. 12 O.S.1981 § 2, *infra; Reaves v. Reaves,* 15 Okl. 240, 82 P. 490, 495 (1905). See also *State Mut. Life Assur. Co. of Amer. v. Hampton, infra* note 3 at 1035–1036 (Opala, J., concurring).

The pertinent terms of 12 O.S.1981 § 2 provide: "The common law, as modified by constitutional and statutory law, judicial decisions

808 P.2d—17

and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma...."

3. See, e.g., *State Mut. Life Assur. Co. of Amer. v. Hampton,* Okl., 696 P.2d 1027, 1031 (1985); *Hood v. Hagler,* Okl., 606 P.2d 548, 552–553 (1980). In *Hampton,* the court held that Oklahoma's "slayer statute," 84 O.S.1981 § 231, "bars a beneficiary who has actually been convicted of the insured's murder or first-degree manslaughter from recovering under the insurance policy," but does not preclude application of the common-law rule which allows, in a civil action following an acquittal, the beneficiary's disqualification upon proof of the crime by a preponderance of the evidence. *Hood* holds that the "dog bite statute," 4 O.S.1981 § 42.1, does not prevent a judgment's reversal for trial court's failure to instruct on common-law negligence.

4. See 23 O.S.1981 § 9, *infra; Mitchell v. Ford Motor Credit Co.,* Okl., 688 P.2d 42, 45–46 (1984) (punitive damages may be recovered when the

late court must consider as *harmless error* the submission of a common-law action on an erroneous theory if there is substantial evidence to support the jury verdict on some other viable form of liability.[5] Jury instructions that do not result in a "miscarriage of justice" or manifest a "substantial violation of a constitutional or statutory right" may not be held reversibly prejudicial.[6] Here, no showing has been made that the objectionable charge reversibly misdirected or misled the jury.[7]

In sum, the verdict for actual as well as punitive damages is supported by substantial evidence in the record. The plaintiffs should not have to stand another trial to satisfy niceties of the law.

I would affirm the plaintiffs' judgment and reverse the judgment favoring the dealer on the cross-claim against the manufacturer.

ALMA WILSON, Justice, dissenting:

I respectfully dissent to the majority opinion in this cause for two reasons. First, even with today's restriction on the tort theory of manufacturers' products liability to claims for loss of "other property" or injury to persons, in my opinion, the entire record convincingly supports the jury verdict in favor of the plaintiffs and the harmless error doctrine is applicable. Second, neither *Kirkland v. General Motors Corporation*, 521 P.2d 1353 (Okla. 1974) nor our subsequent decisions require a specific kind of damages as a prerequisite to a claim of manufacturers' products liability nor limit damages recoverable under the theory of manufacturers' products liability.

---

evidence shows reckless disregard for another's rights, from which malice could be inferred). See also *Wootan v. Shaw*, 205 Okl. 283, 237 P.2d 442, 444 (1951).
The terms of 23 O.S.1981 § 9 are:
"In any action for the breach of an obligation not arising from contract, *where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury*, in addition to the actual damages, *may give damages for the sake of example, and by way of punishing the defendant.*" (Emphasis added.) This statute has since been amended. See 23 O.S. Supp.1986 § 9.

**5.** 12 O.S.1981 § 78, *infra*; 20 O.S.1981 § 3001.1, *infra*; *McDaniel v. McCauley*, Okl., 371 P.2d 486, 489 (1962); *Duncan v. Golden*, Okl., 316 P.2d 1116, 1118 (1957); *Russell v. Flanagan*, Okl., 544 P.2d 510, 511 (1975); *Home Ins. Co. v. Voto-Jacobus Motor Co.*, 189 Okl. 426, 117 P.2d 779, 781 (1941). See also *Winslow v. Watts*, Okl., 446 P.2d 598, 599 (1968) (the court's syllabus ¶ 2) (if legally sustainable, a judgment must stand regardless of the reasons, theories or conclusions on which it is based; it will not be reversed for error unless it is made to appear that the claimed flaws affected the result reached in nisi prius court).
The terms of 12 O.S.1981 § 78 are:
"The court, in every stage of action, *must* disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and *no judgment shall be reversed or affected by reason of such error or defect.*" (Emphasis added.)
The terms of 20 O.S.1981 § 3001.1 are:
"*No judgment shall be set aside or new trial granted by any appellate court of this state* in

any case, civil or criminal, on the ground of misdirection of the jury or for error in any matter of pleading or procedure, *unless* it is the opinion of the reviewing court that the error complained of *has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.*" (Emphasis added.)

**6.** *Messler v. Simmons Gun Specialties, Inc.*, Okl., 687 P.2d 121, 129 (1984).

**7.** Reversal is *never* automatic when proof varies from the plead theory. A variance alone is not ground for reversal unless it is prejudicial and works as a surprise. See *Treadway v. Uniroyal Tire Co.*, Okl., 766 P.2d 938, 948 n. 16 (1988) (Opala, J., dissenting). The harmless error statute (20 O.S.1981 § 3001.1, *supra* note 5) *mandates* that these plaintiffs' judgment be held fit for affirmance since there is *overwhelming evidence to support the verdict based upon another theory that is viable.* Reversible jury misdirection occurs (a) when the instruction is on an unplead theory and the verdict is barren of evidentiary support for any viable theory of liability or (b) when the aggrieved party was prevented by surprise from defending on an unplead theory to which timely objection was interposed. See *Messler v. Simmons Gun Specialties, Inc.*, *supra* note 6 at 129; *Braden v. Hendricks*, Okl., 695 P.2d 1343, 1350 (1985); *Sunray DX Oil Company v. Brown*, Okl., 477 P.2d 67, 70 (1970); *Missouri–Kansas–Texas Railroad Co. v. Harper*, Okl., 468 P.2d 1014, 1020 (1970); *Great Western Motor Lines, Inc. v. Cozard*, Okl., 417 P.2d 575, 576 (1966) (the court's syllabus ¶ 4); *Tyree v. Dunn*, Okl., 315 P.2d 782, 784 (1957); *Martin v. Arnold*, 207 Okl. 69, 247 P.2d 517, 519 (1952).

In June, 1979, plaintiffs purchased the subject mobile home for $22,800.00. Subsequent to the purchase, chronic and continuous internal condensation of liquid vapor accumulated into pools of water within the structure and leaked into the interior of the mobile home. Upon notifying the retail dealer of the leaks, the manufacturer attempted several unsuccessful "cures." The energy saving design caused the condensation, which could not be corrected. The manufacturer's last attempted cure and the continuous condensation over time rendered the mobile home uninhabitable. Neither the dealer nor the manufacturer would replace the mobile home.

After enduring more than four years of difficulties caused by the defectively designed mobile home, this suit was initiated against the dealer and the manufacturer. Plaintiffs' amended petition alleged defective design, breach of implied warranty of habitability, misrepresentation and harassment. Plaintiffs sought damages in the amount of $30,000.00 for replacement of the defective mobile home and exemplary damages in the amount of $50,000.00. The case was tried to the jury. The jury was instructed on the elements of manufacturers' products liability. The jury returned a verdict in favor of plaintiffs and against the manufacturer for $22,800.00 actual damages and $7,200.00 punitive damages.

In my opinion, the overwhelming evidence supports plaintiffs' claim of $30,-000.00 damages for replacement of the uninhabitable, defectively designed mobile home. The evidence established that the manufacturer's design was defective and that the defect could not be corrected by the manufacturer. Deterioration in the mobile home was certain under these circumstances, but the evidence demonstrates more than mere deterioration. There is evidence which supports a finding by the jury that the defectively designed mobile home was "unreasonably dangerous", as well as a finding that it was uninhabitable: the defective design caused pools of water to accumulate about the electrical wiring of the mobile home. The evidence establishes the manufacturer's defective design and the plaintiffs' right to replacement dam-

ages from the manufacturer, whether the evidence as a whole is examined for necessary elements of manufacturers' products liability, the manufacturer's negligence, or the manufacturer's implied warranty of habitability.

This Court has consistently held that a judgment must be affirmed if it is sustainable on any legal or equitable theory, regardless of the reasons given by the trial court in support of the pronouncement, *Utica National Bank & Trust v. Assoc. Prod. and City of Lawton,* 622 P.2d 1061, 1062 (Okla.1981), and, if there is any competent evidence or reasonable inferences from the evidence tending to support the verdict. *Kelley–Webb Realty Co. v. Allen,* 199 Okl. 503, 187 P.2d 986, 987 (1948). The judgment in this cause is supported by the evidence and it is sustainable on the theory of manufacturers' products liability.

The harmless error doctrine, codified at 20 O.S.1981, § 3001.1, requires an appellate court to affirm a jury verdict challenged on the ground of misdirection, unless the erroneous jury instruction has resulted in a miscarriage of justice or constitutes a substantial violation of a fundamental constitutional or statutory rights of the adverse party. Where the instruction directs the jury on legal theories not applicable to the cause, the error will be deemed harmless unless from the record as a whole the instruction resulted in a miscarriage of justice. Erroneous instructions on contributory negligence and assumption of risk were harmless where the entire record revealed no miscarriage of justice in *Kirkland,* 521 P.2d at 1367. Res ipsa loquitor instruction was harmless upon examination of the entire record in *Seay v. General Elevator Company,* 522 P.2d 1022, 1028 (Okla.1974). And, proximate cause instruction did not constitute reversible error unless it is reasonably certain that the jury was misled thereby, *Fields v. Volkswagen of America, Inc.,* 555 P.2d 48, 57 (Okla. 1976). The harmless error doctrine should be applied to preserve the jury verdict notwithstanding the instruction, particularly where, as in this case, this Court pronounc-

es a new rule of law governing the correctness of that instruction.

In *Fields v. Volkswagen of America, Inc.*, this Court approved bifurcation of the issues of liability and damages in a manufacturers' products liability action, implicitly recognizing that liability did not hinge on allegation or proof of a particular kind of damage. In *Thiry v. Armstrong World Industries*, 661 P.2d 515 (Okla.1983), this Court held that exemplary and punitive damages may be alleged and proved as an element of damages in a manufacturers' products liability case because products liability is clearly within the statutory scope of a tort action. Damages recoverable in a tort action are the amount which will compensate for all detriment proximately caused by the breach of an obligation not arising out of contract. 23 O.S.1981, § 61.

In fashioning the manufacturers' products liability theory of recovery of damages caused by defective products, in *Kirkland v. General Motors Corporation*, 521 P.2d 1353, 1362 (Okla.1974), this Court did not limit the recovery of damages under the new common law tort theory. Rather, we said that a products liability action is a tort action for injury to personal property or injury to rights of another, *Kirkland*, 521 P.2d at 1361, and that manufacturers' products liability theory retains the broad protection from defective products previously adopted by the Court, *Kirkland*, 521 P.2d at 1366. Following the rationale in the concurring opinion in *Escola v. Coca–Cola Bottling Co.*, 24 Cal.2d 453, 150 P.2d 436 (1944), *Kirkland* held that it is no longer necessary to rely upon theories of negligence or warranty for recovery of damages caused by defective products, *Kirkland*, 521 P.2d at 1362, and that breach of implied warranty is no longer appropriate for products liability except as provided by the U.C.C., citing the concurrent opinion in *Moss v. Polyco, Inc.*, 522 P.2d 622, 626 (Okla.1974). In *Moss* we said that under the theory of manufacturers' products liability a plaintiff may recover all damages which were the reasonable consequence of the defective article to the same extent allowed in a negligence action. The *Escola* concurring opinion rationale quoted in

*Kirkland*, in summary, is that the marketing of defective products is a constant and general risk to the public no matter how intermittent or haphazard injury therefrom may occur; public interest compels deterrence of marketing of defective products; and, the manufacturer should be responsible for whatever injury may occur because of the marketing of defective products. *Kirkland*, 521 P.2d at 1361.

Nowhere in our prior manufacturers' products liability decisional law has this Court limited the right to maintain a claim of manufacturers' products liability by the kind of damages sought. The underlying public policy and the theory focus on the duty of the manufacturer *not* to market defective products. Personal harm or other property harm is not a required element of the theory. However, where fortuitously the defective product has only caused harm to itself, today's pronouncement denies the plaintiff the right to maintain a manufacturers' products liability action, requiring the plaintiff to return to the breach of implied warranty fiction for recovery of damages under the U.C.C.

Declaring the implied warranty theory inappropriate in *Kirkland*, this Court in *Moss* discussed U.C.C. restriction on the damages for whatever injury may be claimed in the manufacturers' products liability action:

Assuming the non-existence of a valid contract between the plaintiff and a defendant which could possibly, under the terms of the UCC, affect the right of the plaintiff to recover for certain losses, we are of the view that a plaintiff who has suffered damages by reason of a defectively manufactured article may recover under the doctrine of Manufacturers' Product Liability all of the damages which were the reasonable consequences of the defective article to the same extent as if the plaintiff's action was based upon negligence. Should a contract, valid under the UCC limiting plaintiff's right to recover damages for certain items of damage exist however, we know of no reason why such contract could not be given consideration in the same action

in which plaintiff seeks recovery under the doctrine of Manufacturers' Product Liability when the two matters are clearly distinguished by proper instructions. *Moss,* 522 P.2d at 626.

There is no contract between the manufacturer and the plaintiffs in this cause. In the pretrial proceedings, the manufacturer denied any implied warranty of habitability. The single jury instruction on manufacturers' products liability in this cause is appropriate under the "broad protection" expressed in *Kirkland* and the U.C.C. damages limitation defense set out in *Moss.*

Neither allegation nor proof of injury to person or other property is a prerequisite to assertion of the theory of manufacturers' product liability. The delineated elements to be alleged and established by the evidence of the plaintiff do not include any specific kind of injury or loss:

> First of all Plaintiff must prove that the product was the cause of the injury: the mere possibility that it may have caused the injury is not enough.

> Secondly, Plaintiff must prove that the defect existed in the product, if the action is against the manufacturer, at the time the product left the manufacturer's possession and control. . . .

> Thirdly, Plaintiff must prove that the defect made the article unreasonably dangerous to him or to his property as the term "unreasonably dangerous" is above defined.

And,

> We adopt the standard of proof for Oklahoma set forth by the Restatement Second § 402A comment g and define "unreasonably dangerous" as follows:

> "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

> We specifically disapprove of the standard of proof adopted by *Cronin v. J.B.E. Olson Corporation,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972).

*Kirkland,* 521 P.2d at 1362–1363.

Satisfying these elements, but without allegation or proof of damage to person or property other than the defectively designed mobile home, such as a sinus ailment aggravated by the mold in the damp infrastructure or water marks on a piece of furniture inside the mobile home, the majority opinion denies the plaintiffs any right to a manufacturers' products liability tort remedy. In so doing, the majority opinion characterizes plaintiffs' injury or loss to be only deterioration of the product or diminution in bargained for expectations or "economic loss" damages.

The majority relies upon the reasoning in the recent opinion of the United States Supreme Court in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) in denying plaintiffs' right to recover in tort. In *East River,* the Court held that an admiralty common law products liability action may not be maintained for recovery of economic loss caused by a defective product. The Court noted that protection of fishermen is the underlying policy of the admiralty common law strict liability action, which is not implicated in the action. The Court further noted that the defective rings were corrected by the manufacturer and that the loss of business or loss of profit during the time the ships were down is more appropriately settled under the commercial code of the applicable state having jurisdiction over the involved commercial contracts. *East River* did not proscribe recovery of the damages to a defective product in an admiralty strict liability action. It refused to recognize such a right under the pretrial proceedings before it.

The issue of whether economic loss damages may be recovered in a manufacturers' products liability action has been considered under the laws of at least thirty-one state jurisdictions. In deciding the issue, the courts have considered the nature and circumstance of the injury to the defective product; the underlying policy for strict liability; the setting and status of the parties, individual or commercial; and, kind of damages, direct damage to the defective product and indirect damages such as loss

of profits, salaries, or customers. Most of these cases are appeals from pretrial motions; most involve commercial parties and commercial transactions between commercial parties of equal bargaining power; and, most involve damages for loss of business profits as well as injury to the defective product. Review of these cases clearly indicates that this case is inappropriate for a determination of the recoverability of economic loss damages in a manufacturers' products liability claim, especially where the jury verdict is supported by the record.

Nine states allow recovery of damages to the defective product under a tort theory of strict liability. The most similar fact situation is in *Thompson v. Nebraska Mobile Homes Co.*, 198 Mont. 461, 647 P.2d 334 (1982), wherein plaintiff sought damages to a mobile home allegedly rendered unsuitable for living by the use of inferior building materials. Emphasizing policy considerations of the pronounced inequality in bargaining position, the doctrine of strict liability is extended to recovery of the damage for the loss of the defective product itself.

Two other states emphasize policy considerations for allowing recovery: *Hiigel v. GM Co.*, 190 Colo. 57, 544 P.2d 983 (1975). Plaintiff sought recovery of damages to a motor home caused by allegedly defective wheel studs. The court found that limiting a manufacturer's responsibility to property other than the product sold is inconsistent with the language of § 402A. *C & S Fuel Inc. v. Clark Equipment Co.*, 524 F.Supp. 949 (E.D.Ky.1981). Plaintiff sought damages for loss of a tractor due to an alleged engine defect. Under Kentucky law, elements of a cause of action in tort for property damage loss differ from elements in contract and plaintiff may recover for damage to the defective product itself under tort law.

Three states allow tort recovery for economic loss if the defect in the product is considered dangerous: *Northern Power & Engineering Co. v. Caterpillar Tractor Co.*, 623 P.2d 324 (Alaska 1981). Plaintiff sought damages to electrical generator caused by defective low oil pressure shutdown mechanism. Recovery allowed in strict liability in tort when the product creates a situation potentially dangerous to people or other property, even though damage is confined to the product itself. *Russell v. Ford Motor Co.*, 281 Or. 587, 575 P.2d 1383 (1978). Plaintiff sought damages for allegedly defective axle on a truck. The loss that occurs must be a consequence of the kind of danger and must occur under circumstances that make the condition of the product a basis for strict liability, which does not include economic loss due to poor performance or reduced resale value of a dangerously defective product. And, *Corporate Air Fleet of Tennessee, Inc. v. Gates Learjet, Inc.*, 589 F.Supp. 1076 (M.D.Tenn.1984). Plaintiff sought loss of use, reasonable rental value of replacement, and damages to a learjet which crash-landed. Under Tennessee law, if a defect makes the product unreasonably dangerous and the only damage is to the product itself then recovery may be allowed under strict liability.

Three states allow economic loss recovery upon a showing that the defect caused a sudden and calamitous occurrence, rather than deterioration, internal breakdown or nonaccidental harm to the product: *Salt River Project Agricultural Improvement and Power District v. Westinghouse Electric Co.*, 143 Ariz. 368, 694 P.2d 198 (1984). Plaintiff sought $1.9 million for damage to turbine blades and $50,000 in lost profits and expenses. Recovery in strict liability for damage to the product itself is allowed if it occurs in a sudden, accidental manner and the defect is unreasonably dangerous to persons and other property. *Moorman MFG. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). Plaintiff sought economic loss from a crack in a grain storage tank. Recovery of personal injury or property damage resulting from a sudden or dangerous occurrence is allowed in tort, but economic loss from nonaccidental causes is recoverable only under contract theories. And, *Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854 (W.Va.1982). Property damage to a defective product resulting from a

sudden and calamitous event is recoverable in tort.

Twenty-two states deny recovery. Six of those states declare that tort recovery of economic loss has no place in a *commercial* setting and between *commercial* buyers and sellers: *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985). Plaintiff sought damages for defects in transmissions of commercial trucks resulting in needed repairs, towing, replacement parts, lost profits, and decreased value of the trucks. As far as *commercial* buyers are concerned, strict liability is not an appropriate basis for economic loss, such recovery is limited to *individual* consumers. *See also Scandinavian Airlines System v. United Aircraft Co.*, 601 F.2d 425 (9th Cir.1979), applying California law that recovery under products liability does not apply between parties who are in a commercial setting, have similar economic strengths, bargain the specifications of a product and negotiate concerning the risk of loss; *Dairyland Insurance Co. v. GM Co.*, 549 So.2d 44 (Ala. 1989); *McCarthy Well Co., Inc. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312 (Minn. 1987), finding economic loss arising out of a commercial transaction, *except those involving personal injury or damage to other property* are not recoverable under strict products liability; *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Insurance Co.*, 42 Ohio St.3d 40, 537 N.E.2d 624 (1989); and, *Rem Coal Co., Inc. v. Clark Equipment Co.*, 386 Pa.Super.Ct. 401, 563 A.2d 128 (1989).

Thirteen states refuse to extend the tort doctrine to economic loss where the damage is only to the defective product. *Colonial Park Country Club v. Joan of Arc*, 746 F.2d 1425 (10th Cir.1984) applying New Mexico law; *Frey Dairy v. A.O. Smith Harvestore Products, Inc.*, 680 F.Supp. 253 (E.D.Mich.1988); *County of Westchester v. General Motors Co.*, 555 F.Supp. 290 (S.D. N.Y.1983); *Agristor Leasing v. Spindler*, 656 F.Supp. 653 (D.S.D.1987); *Wisconsin Power and Light v. Westinghouse Electric*, 645 F.Supp. 1129 (W.D.Wis.1986); *Florida Power and Light v. Westinghouse Electric Co.*, 510 So.2d 899 (Fla.1987);

*Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784 (1978); *Bay State–Spray & Provincetown Steamship, Inc., v. Caterpillar Tractor Co.*, 404 Mass. 103, 533 N.E.2d 1350 (1989); *Sharp Brothers Contracting Co. v. American Hoist & Derrick Co.*, 703 S.W.2d 901 (Mo.1986); *National Crane Co. v. Ohio Steel Tube Co.*, 213 Neb. 782, 332 N.W.2d 39 (1983); *Local Joint Exec. Bd. of Las Vegas v. Stern*, 98 Nev. 409, 651 P.2d 637 (1982); *Ellis v. Morris, Inc.*, 128 N.H. 358, 513 A.2d 951 (1986); *Hagert v. Hatton Commodities, Inc.*, 350 N.W.2d 591 (N.D. 1984); *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977); *Washington Water Power v. Graybar Electric*, 112 Wash.2d 847, 774 P.2d 1199 (1989); and, *Continental Insurance v. Page Engineering Co.*, 783 P.2d 641 (Wyo.1989).

Because our precedential jurisprudence has not limited manufacturers' products liability theory to recovery of injury to person or property other than the defective product and because this cause has been tried to a jury and the jury verdict is supported by the record as a whole, I respectfully dissent.

I am authorized to state that DOOLIN, J. joins in this dissent.