**512**

DENTCO INVESTMENT COMPANY, INC., a corporation, Parceners, Ltd., a general partnership, Thomas F. Freeman, Joi Dell Freeman, Charles C. Ihrig, Margaret Anne Ihrig, Jack J. Thomas, Phyllis Jacklene Thomas, John F. Freeman, and Jean M. Freeman, Appellants,

v.

OKLAHOMA NATURAL GAS COMPANY, a corporation, Appellee.

No. 47706.

Court of Appeals of Oklahoma, Division No. 2.

Aug. 3, 1976.

Rehearing Denied April 11, 1977.

Certiorari Denied May 16, 1977.

Released for Publication by Order of Court of Appeals Sept. 13, 1977.

Stephen P. Friot, Halley, Spradling, Stagner & Alpern, Oklahoma City, for appellants.

Calvin W. Hendrickson, Gary M. Chubbuck, Pierce, Couch, Hendrickson & Short, Oklahoma City, for appellee.

BRIGHTMIRE, Judge.

An attempt to use a natural gas air-conditioning system in a new 72-unit apartment complex ended in a costly and dismal failure. Oklahoma Natural Gas Company (ONG) became the target of this loss-recouping lawsuit filed by the building owners because, they say, it induced the use of gas equipment by means of a lot of false material representations and contributed to the cause of the loss further by furnishing a negligent design for the system. At trial the judge sustained a demurrer to plaintiffs' evidence and directed a verdict for ·defendant on its cross-action against plaintiffs for the balance due defendant on a note and mortgage it received in exchange for financing the faulty system. Plaintiffs attack both adjudications.

I

Identification of the plaintiffs is: (1) Parceners, Ltd. (Parceners), a partnership, composed of four of the individual plaintiffs who own all the stock of (2) Dentco Investment Company, Inc. (Dentco); (3) various other individual plaintiffs whose identities are irrelevant save that of Thomas F. Freeman. He is president of Dentco and Parceners' managing partner.

II

In the spring of 1970, Dentco obtained a loan commitment for construction of the Brittany Apartments on some land it owned in Oklahoma City, Oklahoma. In May, Thomas Freeman was first approached by James Gross, a sales representative of ONG, who later, through a series of false representations, induced Dentco to borrow $35,-000 from ONG and purchase a natural gas air-conditioning system specified by the gas company.

According to plaintiffs' amended petition, the ONG false representations relied upon were:

"(a) The use of multiple thermostats on each chiller would operate without difficulty and would accomplish the purpose for which the system was designed.

"(b) The units would be free of excessive noise and vibrations.

"(c) Other similar units were operating in Oklahoma City on apartment complexes without difficulty.

"(d) Depreciation on the units would be less than on electric units.

"(e) Maintenance costs on the units would be less than on electric units.

"(f) The savings in fuel consumption would exceed the monthly payments on the second mortgage.

"(g) Only minor adjustments on the units could make them operative after trouble developed."

In making these representations, ONG is alleged to have committed an act made unlawful by the Oklahoma Consumer Protection Act[1] and one designated a deceptive trade practice forbidden by the Oklahoma Deceptive Trade Practices Act.[2]

Then for their "First Cause of Action" plaintiffs adopted these allegations and added that because of such transgressions, consideration for the $35,000 note and its securing second mortgage failed entitling them to a cancellation of the mortgage.[3]

For their "Second Cause of Action" plaintiffs again adopted all earlier allegations and tersely stated, "That they have been damaged in the amount of $190,230.75 as a direct and proximate result of the acts of the Defendant as above alleged."

And for a "Third Cause of Action" plaintiffs asked that defendant be "permanently enjoined from engaging in practices violative of the Deceptive Trade Practices Act."

ONG answered with a general denial and cross-petitioned for a $33,632.72 balance due on the note and foreclosure of its mortgage.

### III

A pretrial conference order filed December 20, 1973 recited that plaintiffs sought recovery on these theories:

1. Negligence
2. Fraud, misrepresentations
3. Breach of Contract
4. Oklahoma Deceptive Trade Practices Act.

The case was tried for three days in the presence of a jury, commencing May 14, 1974, before the trial judge disposed of it in the manner mentioned earlier.

### IV

Plaintiffs' attack on the judgment—sustaining a demurrer to their evidence—is not premised on the theory that their evidence will support a finding of fraud on defendant's part but that it presents a "prima facie case" of (1) "negligence" and (2) "liability ex contractu." And so we will examine these two points.

### V

To support a case of negligence, plaintiffs contend that by undertaking to design the Brittany gas air-conditioning system defendant had a duty to use reasonable care and professional skill—a duty which it breached causing damage. ONG, on the other hand, insists that negligent it could not have been because (a) it "did not undertake to design an air-conditioning system for plaintiffs" so that it never came under such a design duty; or (b) if a duty there was, evidence is not recorded that it was breached.

### VI

This lawsuit had its genesis during the hot summer of 1970 when an ONG representative, James Gross, prevailed upon Thomas Freeman—a man who for 12 years had spent half his time practicing dentistry and the other half building large apartment projects and operating various businesses, including a liquor store—to use gas equipment in the Brittany project. Earlier, Dentco had obtained a loan commitment to build the apartments based upon plans calling for the use of electric air-conditioning equipment, costing $35,000 less than its comparable gas counterpart. During the spring of 1970, Dentco transferred the Brittany property and project to Parceners.

At the time Gross made his midsummer plea, Freeman and his associates had al-

---

1. 15 O.S. 1975 Supp. §§ 751 et seq.

2. 78 O.S. 1971 §§ 51 et seq.

3. Perhaps the prayer should have been to cancel the note because fate of the mortgage will follow the note.

ready decided against using gas-energized air conditioning on the Brittany project because of a bad experience with such equipment on another large apartment group called the Marquis Apartments.

Gross, who considered himself an expert on gas air-conditioning systems in 1970, told Freeman that · the Whirlpool equipment used on the Marquis was being superseded by a new series, estimated the monthly savings from using gas units at the Brittany at about $750 per month, and, to promote the use of natural gas, told Freeman that if he would go "total gas" in the Brittany Apartments, ONG would finance the $35,000 extra gas equipment costs with a repayment rate of less than the monthly savings. He also promised that ONG would prepare and provide plaintiffs with plans for a trouble-free, gas-energized air-conditioning system at the Brittany Apartments. Plaintiffs accepted the deal. ONG drew the plans, loaned plaintiffs the money necessary to buy the gas equipment specified by such plans, and a contract was made with an installation company to supply and install Whirlpool units at a cost of $56,272. This was August 5, 1970.

The first thing to happen was that when the contractor tried to buy the equipment, he discovered that Whirlpool had quit making it entirely. This almost caused Freeman to again go electric but Gross regained his confidence by saying there were two other brands available—Bryant and Arkla—and that ONG "had had absolutely no difficulty with Arkla equipment; [that] they had had it installed for a number of years, [including] on an apartment complex . . . [and] that they had had no difficulty whatsoever for two years," save for minor start-up problems. Freeman responded to this by saying, "James [Gross] if you are lying to me I will break your neck. Because . . . we [have] had enough trouble with gas."

Freeman, however, knew from previous experience with larger gas air-conditioning equipment that from an energy-consumption standpoint the gas operation costs less and this undoubtedly made him an easier

mark for Gross. Good businessmen try to cut costs and Freeman was a good businessman.

## VII

The ONG plans were general and did not contain detailed specifications. They did, however, establish design of the system, including duct work layout and specifications as to the number, location, type, and tonnage of the chiller units and coil sizes. The plans called for twenty chiller units of 5-ton capacity and four chiller units of 3-ton capacity, although at Freeman's suggestion Gross agreed to an ultimate installation of twelve 5-ton chillers and twelve 3-ton units.

The basic components of the system were chillers, coils, water pipes and controls. The function of the chiller was to produce cold water to circulate through copper or plastic pipe running from a zone chiller to an individual coil in each apartment. The way it worked was that cold water circulated through the coil absorbing heat from the apartment air blown across it by a fan. The water then returned to the chiller for rechilling. Removal of heat from the apartment air thus resulted in a reduced temperature.

The chillers installed at Brittany were designed to operate either on or off. There was no means of modulation to achieve an intermediate rate of operation. If the need was for less than maximum capacity, the Arkla chiller would overchill or freeze the water, causing the unit to overheat and eventually be shut off by an overload safety device.

The system designed by ONG for Brittany was referred to as a "zoned controlled" one. It consisted of 24 separate cooling circuits with each 5-ton chiller serving four zones and each 3-ton chiller serving two zones. Each zone was designed so as to provide one ton of air conditioning for every 400 to 600 square feet of floor space. The way it worked out each 5-ton chiller served four apartments and the 3-tonners cooled two living units. Each apartment in turn contained a thermostat, giving its occupant independent control over its zone chiller.

What happened when this system was put into actual operation was a frequent freezing of the circulating water, causing the water-starved machine to overheat and, in the fullness of time, to fail. For example, if three units of a 4-apartment zone contained air with a temperature of 68° and the other unit rose to 80°, due, say, to cooking, then (assuming all four thermostats were set at 68°) the latter apartment's thermostat would activate its 5-ton zone chiller. It would run at maximum 60,000 BTU's capacity—over three times the number needed—in an effort to reduce the fourth apartment's temperature to its thermostatic level. Before this level could be reached, however, the excessive capacity would cool the circulating water faster than the water could absorb heat from the one apartment and would eventually freeze the water, resulting in a complete loss of air conditioning for all four apartments until thawing restored circulation. The overheating that accompanied such freezing damaged the chiller generator, requiring frequent replacements, and otherwise shortened the life of the machines. During the summer of 1971—the first cooling season the system operated—service calls were made almost daily, consuming in excess of 100 man-hours.

During the early summer months of 1972, the manufacturer reviewed the system and made some major modifications, namely, the installing of external pumps and aquastats. Evidently, there was some improvement but there still remained a failure to provide adequate air conditioning—a failure ONG personnel said they could not find the cause of.

Finally, about midway through the 1972 summer, Gross said he "didn't know what else to do to the system" and told Freeman he did not blame him for deciding to replace it with electric equipment.

A licensed professional engineer testified that an air-conditioning system design, such as that furnished by ONG for the Brittany Apartments, failed "to take into consideration . . . knowledge and design factors which would be taken into considera-

tion by prudent competent designer[s] guided by accepted principles of [equipment] application and design." For reasons not entirely clear, the trial court prevented him from giving further relevant expert testimony.

## VIII

The foregoing facts, which are virtually undisputed, lead inexorably to one inescapable conclusion and that is that ONG did "undertake to design an air-conditioning system for plaintiffs." In so doing, gas company incurred the legal responsibility for "injury occasioned . . . by [its] want of ordinary care or skill . . . ." 76 O.S. 1971 § 5(a). ONG's argument that it simply undertook to provide a set of "preliminary plans," which were "rudimentary" and intended to be a "layout diagram," rather than a system design, is an unimpressive exploitation of semantics and one to be more appropriately addressed to another element of legal negligence called causation, namely, was the nature of the design furnished by ONG related to the cause of the failure or wasn't it? From the facts we have already recited, it appears to have been. The Arkla equipment was not created to operate efficiently in the circumstances of ONG's multiple-thermostatic-system design. What ONG tries now to do is shift blame for the failure of its system design to faulty equipment design, but this will not work because ONG was bound to know of the inherent design characteristics of the Arkla equipment when incorporating it in its system plan. In preparing and submitting the air-conditioning plan, ONG was bound to employ reasonable care, skill and diligence, and the professional standards expected of one holding itself out as having expertise in the area of gas air-conditioning systems. Such obligation is comparable to that owed by architects and engineers generally—an obligation defined in *Wills v. Black and West, Architects,* Okl., 344 P.2d 581 (1959) and *Smith v. Goff,* Okl., 325 P.2d 1061 (1958).

Whether ONG fulfilled its assumed responsibility was therefore a significant trial

issue. ONG says, of course, that there is no "evidence in the record sufficient to establish any breach of such duty to exercise care." Maybe so. But being careful is only a part of its duty. The gas company was also required to use diligence in offering a system reasonably fit for the purpose intended and capable of achieving the represented objectives. The evidence is sufficient to permit a jury to find that ONG's efforts to think through the workability of its system design were something less than diligent and unprofessionally failed "to take into consideration design and knowledge and design factors which would be taken into consideration by prudent competent designer[s] guided by accepted principles of . . . design." Incidentally, the question that brought forth this expert response was not seeking information about how to install the equipment, as ONG suggests, but about whether a system installed in accordance with ONG's system design, as this one was, demonstrated by its melancholy performance that its creator did not bring to the task such knowledge and did not take into consideration those sound principles of design which a prudent professional would have.

■ Evidence explaining why the Brittany air-conditioning system failed furnishes a basis for finding a causal relation between the failure and faulty system design. For, given the known characteristics of the Arkla equipment, ONG could have reasonably foreseen the ultimate impracticability of its plan.

■ And beyond establishment of these elements of negligence was proof of the resulting detriment suffered by plaintiffs.

We hold the demurrer to plaintiffs' evidence should not have been sustained.

### IX

Plaintiffs' second proposition is that the evidence was also sufficient for their recovery of damages for ONG's breach of a continuing covenant that installation of the gas-energized air-conditioning equipment, recommended by it according to its plans, would result in a $750 a month savings over use of electric equipment for the 15 to 20-year life of the gas equipment.[4] They refer to *Bowman v. Oklahoma Natural Gas Co.*, Okl., 385 P.2d 440 (1963) as offering a legal foundation for their contention.

■ *Bowman* does appear to be relevant. There, in a second cause of action, plaintiffs sought "damages in the sum of $100.00 a month for an average of six months a year for the years 1951 to 1958 inclusive, which they allege were expended for excessive amount of gas, water and electricity to operate the unit installed"—a unit which plaintiffs were induced to install when "Oklahoma Natural represented that if they would install [it] that the same could be operated for at least $50.00 a month cheaper than any mechanical unit . . ." The allegation was "that instead of operating at a less cost, the operation cost the plaintiffs $100.00 more a month to operate than a similar mechanical unit." According to the opinion, the contention of the plaintiffs was "that such representations are continuing, with a new and separate cause of action accruing each and every month in which the actual costs of operation exceeded that represented by Oklahoma Natural . . . ." The continuing covenant concept—introduced by the court to rescue some of plaintiffs' cause of action from the clutching claws of the statute of limitations—incorporates the notion that a representation is a covenant. The operative facts in evidence here are very similar to those pleaded in *Bowman* and therefore require a like conclusion, namely, that if plaintiffs altered their position in reliance upon ONG's representation that their proposed gas-fired air-conditioning system would result in a savings of $750 per month for 15 to 20 years, the inducing representation ripened into a "continuing covenant."

4. The net savings would be reduced by $35,000, however, because the gas equipment costs that much more than electric.

ONG's response to the *Bowman* covenant doctrine is an attempt to persuade us that the "statements made by James Gross of ONG to Freeman concerning the savings to be anticipated were clearly on opinion and judgment as to future expectations over a 20-year period . . . not . . . ironclad guarantees." The question is not, however, whether the statements were "ironclad guarantees" but whether they were representations made to induce plaintiffs to buy and use gas-consuming equipment.

The statements made by Gross in 1970 so closely resemble those held to be actionable in *Bowman* that we need not explore the matter beyond recitation of the evidence. Said James Gross, "[T]he operational expenses, the utility, use of the gas system [is] considerably less than what it would be with the electric system . . . .. And that the maintenance [is] just practically nill [sic] because there [are] very few moving parts. . . . [T]he longevity of the equipment [is] fifteen or twenty years. . . . [E]ven though . . . gas equipment [is] considerably more expensive that the Oklahoma Natural Gas Company would finance that . . . and would put it on a note that [plaintiffs] could pay out in five years with the savings . . . made on the utilities. . . . [Plaintiffs] then would have the last fifteen years as a profit. . . . [Plaintiffs] would have . . . savings [of] approximately $750.00 a month."

■ We hold plaintiffs' evidence entitled them to have their quest for damages presented to the jury on at least two theories—negligence and breach of a continuing covenant. *C. I. T. Corp. v. Shogren*, 176 Okl. 388, 55 P.2d 956 (1936). Therefore, the judgment, based on the sustention of a demurrer to plaintiffs' evidence and on a directed verdict favoring defendant on its cross-petition, is reversed and the cause is remanded for further proceedings.

NEPTUNE, J., concurs.

BACON, P. J., concurs in result.