**NMP CORPORATION, Plaintiff,**

v.

**PARAMETRIC TECHNOLOGY CORPORATION,
Defendant.**

**No. 96–C–116–K.**

United States District Court,
N.D. Oklahoma.

March 31, 1997.

Brian S. Gaskill, C. Raymond Patton, Sneed Lang Adams Hamilton & Barnett, Tulsa, OK, for NMP Corp.

J. David Jorgenson, Inhofe Jorgenson Balman & Waller, Tulsa, OK, Robert E. Sullivan, Paul M. Welsh, Robert E. Sullivan & Associates, Boston, MA, for Parametrics Tech. Corp.

## ORDER

KERN, Chief Judge.

Before the Court is Defendant's Motion for Summary Judgment (docket # 9).

### Statement of Facts

The Plaintiff, NMP Corporation ("NMP") is an Oklahoma corporation in the business of manufacturing and designing large mechanical switchboards, mostly for use by the United States Navy. The Defendant, Parametric Technology Corporation ("Parametric"), is a Massachusetts corporation that develops and manufactures software to assist mechanical

engineers in product development and manufacturing. The dispute at issue arises out of Parametric's granting of a license to NMP to use Parametric's ProENGINEER® ("Pro/E") software to assist in NMP's design and manufacture work.

· In July of 1993, Parametric contacted NMP to introduce the Pro/E software and its capabilities. Several demonstrations of the ·Pro/E software were conducted prior to Parametric's licensing of the software to NMP. The first demonstration was conducted in July, 1993. Two Parametric employees, John Forbes and Richard Barrett, met with Marcus Jones and other NMP engineers to present an initial software demonstration. A second demonstration was conducted in August, 1993 for the NMP engineers, and at that time a decision was made to present a software demonstration to the NMP management. Parametric personnel were given a tour of the NMP facilities, and the engineers from NMP and Parametric worked together to develop a demonstration. Since the demonstration model was not completed, NMP supplied Parametric engineers with a production drawing, and Parametric engineers completed the demonstration model at Parametric facilities. The allegations of fraud, misrepresentation and gross misconduct arise out of the third demonstration of the Pro/E software which was presented to NMP management in September, 1993. The parties dispute what exactly the demonstration model represented, although the parties agree that it depicted a portion of an NMP switchboard with circuit breakers. Marcus Jones, NMP's engineering manager, asserts that the model appeared to be a fully detailed switch, although he admits that the model was not a fully detailed switchboard since it did not contain all the parts represented in the production drawing submitted to Parametric. Parametric engineers assert that the demonstration model was merely a prototype of something that NMP could do with the Pro/E software. Parametric claims that the demonstration was never intended to be an example of NMP's largest assemblies, but was merely meant to show Pro/E's capabilities in a way that non-engineering upper management at NMP could understand. The parties do not dispute that the

demonstration was presented to NMP management using a Silicon Graphics computer and that the regeneration of the model and drawings in the demonstration took place in a matter of 30 seconds to a couple of minutes. It appears from the record that there was never any discussion at the demonstration regarding the number of parts displayed in the demonstration model or whether the software would operate at the same speed when using more complex designs.

After the demonstration, it became clear that NMP management would seek a license from Parametric to utilize the Pro/E software. At that point, Marcus Jones and John Forbes, Parametric's district sales manager, discussed selection of hardware to run the Pro/E software. Jones admits that Forbes would not recommend any one hardware over another, but rather mentioned several brands which could operate the Pro/E software. It is undisputed that Jones decided to choose the Silicon Graphics computer, the same model computer utilized in the demonstration. Parametric and NMP executed the Pro/E licensing agreement on September 17, 1993. Sometime in the fall of 1993, NMP purchased Silicon Graphics computers and installed the Pro/E software. The software apparently performed successfully on small assemblies, and NMP did not have any difficulties until April, 1994. At that point, NMP was attempting to utilize the Pro/E software in some of its larger assembly pieces. NMP notified Parametric of the difficulties, and Parametric engineers visited NMP in June, 1994 and made several recommendations. Specifically, Parametric recommended that NMP increase the computer memory on the Silicon Graphics machines; utilize configuration states, a function which had recently become available in the latest release of Pro/E (rev 13.), and which NMP had recently installed; hire an on-site consultant from Parametric to ease the implementation process; work in shaded or wireframe mode now available in rev 13.; and send engineers to advance design and assembly classes. NMP implemented all of these recommendations with the exception of hiring a consultant and sending their engineers to advanced training. NMP asserts that implementation of these

changes took place over the course of several months—from June to November, 1994. According to NMP, new problems arose despite the memory upgrades and new methods implemented. Parametric was once again consulted, and the parties worked together from November, 1994 until August, 1995 to try to work out the difficulty. According to Parametric, the problem lay in NMP's choice to use the Silicon Graphics hardware, which had been discontinued sometime after it was purchased, and which now was having difficulty handling the needs of NMP at the speed level required by NMP. Marcus Jones became concerned at some point during the November, 1994 through August, 1995 period that the problems could be the result of NMP personnel. NMP went so far as to advertise on the Internet for an engineer with Pro/E experience.

According to NNP, in August, 1995 it first began to suspect that the problems it was experiencing were caused by the Pro/E software itself Eventually, the decision was made to abandon the software, and Parametric was advised of this decision September 25, 1995. NMP requested that Parametric refund the money spent on the Pro/E software, as well as compensating NMP for the additional moneys expended trying to implement the Pro/E software. Parametric refused to meet this demand, and NMP filed this lawsuit on February 16, 1996 alleging that Parametric fraudulently represented in the September demonstration to NMP management that the Pro/E software could be used to create and detail a typical NMP switchboard. NMP further asserted in its Complaint that Parametric made the following additional misrepresentations:

A.  Use of the software would allow development of models which would allow NMP to check physical interference between mechanical and electrical components.

B.  Two dimensional drawings would be developed automatically from the model and only require minor dimensional placement corrections and adding of notes thereby eliminating a large majority of drafting.

C.  The drawings and models provided by the software would be parametric; therefore, any changes in the models would automatically update the drawing or a change in the drawing would update the models.

D.  The software would allow parts lists to be automatically developed from the models, thereby eliminating the manual development of parts lists.

E.  The software would allow process sheets to be developed from the models.

F.  The software would allow significant switchboard changes to be made almost immediately with complete detail update.

Pursuant to these claims, NMP seeks rescission of the contract and recovery of monies paid in attempting to utilize the Pro/E software.

In the event that the Court determines that rescission is not an appropriate remedy, NNP also asserts a claim for breach of contract under the Licensing Agreement. NMP claims that the Pro/E software was defective, not merchantable, and not fit for the particular purpose for which it was sold. NMP seeks recovery of money paid for the hardware, and expenses related to the software and hardware.

NMP also asserts a claim for gross negligence. NMP contends that Parametric had a duty to comply with the standard of reasonable care in selecting a software program which would be sufficient to meet the needs of NMP, and that Parametric was grossly negligent in recommending Pro/E software to NMP.

Parametric seeks summary judgment on all of NMP's claims asserting that 1) all causes of action are barred by the one year limitations period stated in the Licensing Agreement; 2) the alleged fraudulent misrepresentations regarding the capabilities of Pro/E software are all true features of the software; 3) NMP personnel knew that the demonstration did not purport to represent a fully detailed NMP switchboard; 4) NMP's claim for gross negligence is barred pursuant to the economic loss rule; and 5) even if NMP's claims are valid, the damages must

be limited to recovery of amounts actually paid to Parametric by NMP as required under the Licensing Agreement.

### Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ. P.* 56(c). The Court must view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). Where the nonmoving party will bear the burden of proof at trial, that party must "go beyond the pleadings" and identify specific facts which demonstrate the existence of an issue to be tried by the jury. *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992).

### Discussion

### I. Choice of Law

■ Before considering the merits of each party's contentions, the Court must first determine what law applies to each of the Plaintiff's claims. In actions where jurisdiction is based upon diversity, the substantive law, including the choice of law rules, of the forum state are applied. *Moore v. Subaru of America*, 891 F.2d 1445, 1448 (10th Cir.1989).

Under the terms of the Licensing Agreement, the parties determined that the Agreement would be governed by and "interpreted, construed and enforced as a sealed instrument in accordance with" Massachusetts law. *Appendix to Plaintiff's Response, Exhibit 2* ¶ 13(a). The Agreement further states that

> PTC's [Parametric's] maximum liability arising out of the creation, license, supply, or use of the licensed products, whether based upon warranty, contract, tort or otherwise, shall not exceed the actual payments received by PTC from customer in connection therewith. In no event shall PTC be liable for special, incidental or consequential damages, including, but not limited to, loss of profits, loss of data or loss of use damages arising out of this

agreement or the creation, license or supplying of the licensed products. Even if PTC has been advised of the possibility of such damages, customers shall not bring any suit or action against PTC for any reason whatsoever more than one year after the related cause of action has accrued.

*Appendix to Plaintiff's Response, Exhibit 2* ¶ 9. NMP asserts that the choice of law provision applies only to the breach of contract claim. It further contends that Oklahoma law governs the tort causes of action, and thus a limitations period of two years from the date of discovery of the tort applies to Plaintiff's tort claims pursuant to Okla. Star. tit. 12 § 95. NMP also submits that even if the contractual choice of law applies to the tort claims, the one year limitations period is unenforceable under Oklahoma law pursuant to Okla. Stat. tit. 15 § 216.

In response, Parametric claims Okla. Stat. tit. 15 § 216 does not apply to tort claims, citing *McDonald v. Amtel, Inc.*, 633 P.2d 743 (Okla.1981). Parametric also asserts that the Oklahoma Uniform Commercial Code, which allows contractual limitations on commencement of a lawsuit, applies to the Licensing Agreement, and thus such provisions do not violate Oklahoma public policy, citing *Graphic Sales, Inc. v. Sperry Univac Division, Sperry Corp.*, 824 F.2d 576 (7th Cir.1987) (implying that the Uniform Commercial Code applied to leases of computer equipment); *Colonial Life Ins. v. Electronic Data Systems*, 817 F.Supp. 235 (D.N.H.1993) (holding that the Uniform Commercial Code specifically encompassed a software licensing agreement).

### A. NMP's Breach of Contract Claim

■ The Oklahoma choice of law rules governing contracts require application of the law of the state chosen by the parties unless (1) a provision violates law in the forum state; (2) the forum state has a materially greater interest in the issue; and (3) the forum state would be the proper state chosen under ordinary choice of law provisions. *Moore*, 891 F.2d at 1449; Restatement (Second) Conflict of Laws § 187 (1971 & Supp.1988). Thus, Massachusetts law will

generally apply to the provisions of the Licensing Agreement, unless a certain provision is contrary to Oklahoma law, Oklahoma has a materially greater interest in the issue, and Oklahoma law would be applied under ordinary conflict of law rules.

The first issue to be resolved is to determine whether limiting the time in which a party may initiate a cause of action violates Oklahoma law. As to the Plaintiff's breach of contract claim, whether a contractual statute of limitations violates Oklahoma law depends upon whether the Licensing Agreement constitutes a sale of goods. Under Okla. Stat. tit. 12A § 2–725, parties to a contract for the sale of goods can limit the time in which a cause of action can be brought to no less than one year; however, under Okla. Stat. tit. 15 § 216, such limitations are prohibited as to all other contracts.[1]

■ Software licenses are difficult to categorize as goods because they possess elements of both intangibles and goods which are treated differently under the Uniform Commercial Code ("UCC"). *See*, Bonna L. Horovitz, *Note, Computer Software As a Good Under the Uniform Commercial Code: Taking the Byte Out of the Intangibility Myth*, 65 B.U.L.Rev. 129, 149 (1985). Additionally, software licenses such as the one currently at issue involve elements of service contracts, which are specifically excluded from Article 2 coverage. *Id.* at 138. Oklahoma courts have not addressed the issue of whether a software license would constitute a sale of goods; however, Massachusetts has considered the issue, at least indirectly. In *VMark Software v. EMC Corp.*, 37 Mass. App.Ct. 610, 642 N.E.2d 587, 590, n. 1 (1994), the Massachusetts Court of Appeals assumed that Article 2 of the UCC applied to a software licensing agreement and held that the licensee met its burden of proof regarding allegations of misrepresentation by the licensor of a software program. This application is consistent with the holding in the majority of cases addressing the issue. *See e.g., Colonial Life Ins. Co. v. Electronic Data*

*Sys. Corp.*, 817 F.Supp. 235 (D.N.H.1993) (holding that the UCC applies to a computer software license with an additional obligation to provide incidental services where the predominant thrust of the contract was the sale and support of the software); Andrew Rodau, *Computer Software: Does Article 2 of the Uniform Commercial Code Apply*, 35 Emory L.J. 853 (1986) (arguing that computer software licensing agreements should be considered sales of goods for UCC purposes); Stephen J. Sand, Annotation, *Validity, Construction, and Application of Computer Software Licensing Agreements*, 38 A.L.R. 5th 1, 20–21 (1996) (citing 20 cases in which the UCC was either directly or indirectly held to apply to agreements involving computer software licenses). This Court adopts the reasoning of the New Hampshire district court in *Colonial Life Ins. Co. v. Electronic Data Sys. Corp.*, 817 F.Supp. 235 (D.N.H.1993), and holds that the licensing agreement at issue in this case constitutes a sale of goods under the Oklahoma Uniform Commercial Code. Although the Licensing Agreement contemplated that Parametric would provide services to NMP, the purpose and main thrust of the agreement was to support implementation of the Pro/E software at NMP.

■ Since the Court has determined that the Licensing Agreement constitutes a sale of goods governed by the Oklahoma Uniform Commercial Code, the contractual limitations period does not violate Oklahoma public policy. Similarly, the warranty exclusion and remedy limitation provisions of the Licensing Agreement are valid under Oklahoma law. Oklahoma Uniform Commercial Code allows parties to contractually exclude all implied warranties as long as the language is clear, unambiguous, and conspicuous. Okla. Stat. tit. 12A § 2–316. Oklahoma law likewise permits limitation of remedies for breach of contract unless such limit would be unconscionable. Okla. Stat. tit. 12A § 2–719. For the foregoing reasons, Massachusetts law will be applied to NMP's breach of contract claim.

---

1. Okla. Stat. tit. 15 § 216 states in relevant part that "[e]very stipulation or condition in a contract, by which any party thereto is restricted from enforcing his rights under the contract by

the usual legal proceedings in the ordinary tribunals, or which limits the time within which he may thus enforce his rights, is void".

### B. NMP's Tort Claims

Although the Licensing Agreement does not appear to contain a choice of law clause specifically covering tort claims which might arise from the pre-Licensing Agreement negotiations, it does contain language which impacts NMP's tort claims. The choice of law clause states that the Agreement itself would be governed by, interpreted, construed, and enforced as a sealed instrument in accordance with Massachusetts law; thus, Massachusetts law will generally apply to these provisions of the Licensing Agreement, unless a certain provision is contrary to Oklahoma law, Oklahoma has a materially greater interest in the issue, and Oklahoma law would be applied under ordinary conflict of law rules.

■ NMP asserts that Okla. Stat. tit. 15 § 216 renders application of the limitations clause void. In response, Parametric claims Okla. Stat. tit. 15 § 216 does not apply to tort claims, *citing McDonald v. Amtel, Inc.,* 633 P.2d 743 (Okla.1981). While it is true that the Oklahoma Supreme Court in *McDonald* held that Okla. Stat. tit. 15 § 216 does not apply to tort claims, Parametric fails to address the ultimate finding in that case. In *McDonald,* the parties had entered into a contract to supply gasoline, oil, and accessories to a service station. *McDonald,* 633 P.2d at 744. The contract between the parties provided that "no civil or equitable action under the provisions of any Federal or State anti-trust laws by either party against the other shall be brought unless instituted within two (2) years of the date of the transaction upon which the action is based." *Id.* The court held that, although the contractual provision did not violate Okla. Stat. tit. 15 § 216, it did violate Article 23, § 9 of the Oklahoma Constitution which states that "[a]ny provision of any contract or agreement, express or implied, stipulating for notice or demand other than such as may be provided by law, as a condition precedent to establish any claim, demand, or liability, shall be null and void." Thus it appears that under the reasoning of *McDonald,* the provision in the Licensing Agreement requiring that any suit or action

against Parametric be brought within one year after the cause of action has accrued, is null and void under Oklahoma law as applied to NMP's tort claims. Likewise, under Oklahoma law, a party cannot contractually limit damages incurred as a result of it's own gross negligence or fraud.[2] *Elsken v. Network Multi–Family Security Corp.,* 49 F.3d 1470, 1475 (10th Cir.1995); *Sumner v. Southwestern Bell Yellow Pages, Inc.,* 110 B.R. 377 (Bankr.N.D.Okla.1990); *Vails v. Southwestern Bell Telephone Co.,* 504 F.Supp. 740 (W.D.Okla.1980); *Elsken v. Network Multi–Family Security Corp.,* 838 P.2d 1007, 1010 (Okla.1992).

■ Since both of the contractual provisions pertaining to limitation of damages and limitation of time to file suit as applied to NMP's tort claims violate Oklahoma public policy, the Court must determine whether Oklahoma has a greater interest in the tort claims, and whether Oklahoma law would govern after applying ordinary conflict of law rules. Under Oklahoma conflict of law rules, the rights and liabilities of parties in a tort action are to be determined by the substantive law of the state having the most significant relationship to the occurrence and to the parties involved. *Childs v. State of Oklahoma ex. rel. Oklahoma State University,* 848 P.2d 571, 578, n. 41 (Okla.1993); *Brickner v. Gooden,* 525 P.2d 632 (Okla.1974) (rejecting the lex loci delicti rule in favor of the approach taken in the Restatement (Second) Conflict of Laws § 145). The factors to be taken into account and to be evaluated according to their relative importance with respect to a particular issue, shall include: (I) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties occurred. *Brickner,* 525 P.2d at 637. It is clear under analysis of these factors both that Oklahoma law would be applied under ordinary conflict of law rules, and that Oklahoma has a materially greater interest in the tort claims than does Massachusetts. Par-

---

2. Parties can contractually limit damages arising from ordinary negligence claims, but the Court does not understand NMP to be asserting any allegations based on ordinary negligence.

ametric came to Oklahoma in an effort to sell its Pro/E software to NMP, an Oklahoma corporation with its principal place of business in Oklahoma. The three demonstrations, and, in particular, the demonstration giving rise to the tort claims, occurred in Oklahoma. The Licensing Agreement was signed in Oklahoma, and all significant interactions between the parties took place at NMP's headquarters in Oklahoma.

The contractual provisions affecting NMP's tort claims violate Oklahoma public policy, Oklahoma has a materially greater interest in the tort causes of action than does Massachusetts, and Oklahoma's conflict of laws rules would apply Oklahoma law. Because these three criteria have been met, those contractual provisions relating to limitations of damages and time restraints on instituting a cause of action are stricken as to NMP's tort claims, as required under the severability clause of the Licensing Agreement.[3] Since the severance of those portions of the Licensing Agreement leaves no mention of tort causes of action in the Licensing Agreement, the Court, in accordance with ordinary conflict of law rules as applied in the preceding paragraph, will apply Oklahoma law to NMP's tort causes of action.

Now that the Court has determined the legal standards applicable to NMP's claims, it is necessary to resolve whether NMP has presented sufficient evidence to warrant a trial on the merits of each of its causes of action.

### H. *Fraud and Misrepresentation*

■ To establish a cause of action for fraud under Oklahoma law, NMP must prove with reasonable certainty (1) a material false representation, (2) made with the knowledge of its falsity, or recklessly made without knowledge of its truth, and as a positive assertion, (3) with the intention that it be relied upon by another, and (4) reliance by another party to its injury. *Whitson v. Oklahoma Farmers Union Mut. Ins. Co.*, 889 P.2d 285, 287 (Okla.1995). A cause of action for fraud must be brought within two years

of the discovery of the fraud. Okla. Stat. tit. 12 § 95.

■ Parametric asserts that it is entitled to summary judgment on two grounds: (1) the cause of action is time barred; and (2) there is no evidence that Parametric ever made a false representation about the capabilities of the Pro/E software; or alternatively, if there were false representations made, they were not knowingly or recklessly made. The Court finds that a genuine issue of material fact exists as to when the alleged fraud should have been discovered; therefore summary judgment will not be granted as to NMP's fraud claim on the ground that it is time barred.

As to Parametric's second ground for summary judgment, Parametric contends that all of the allegedly fraudulent statements made regarding the capabilities of Pro/E are true features of the software. Parametric has provided evidence suggesting that the software is performing as expected at other manufacturing sites creating products which are more complex than those manufactured at NMP. Additionally, Parametric has provided testimony from NMP employees admitting that many of Pro/E's professed benefits have been successfully utilized at NMP.

■ The Court finds that Parametric has presented conclusive evidence that the allegedly misleading statements listed in the Complaint regarding Pro/E's capabilities are in fact true statements, and thus summary judgment as to those statements is granted. Not only are other companies using the Pro/E software to perform those functions (*Exhibit 3, Defendant's Response to Plaintiff's Supplemental Brief*), NMP engineers have admitted that they have successfully implemented each of Pro/Es functions when using it on smaller assemblies (*Exhibits 1 & 2, Defendant's Response to Plaintiff's Supplemental Brief*). Thus, any misrepresentation that may have occurred must be attributed to the visual demonstration of the Pro/E software.

---

**3.** Paragraph 13(g) of the Licensing Agreement states that "[i]t is intended that this Agreement shall not violate any applicable law and the unenforceability or invalidity of any provision ... shall not affect the force and validity of the remaining provisions and such invalid provisions shall be deemed severed herefrom."

■ Parametric asserts that NMP knew that the computer demonstration did not represent a fully detailed NMP switchboard, and thus any misrepresentation based upon the demonstration is groundless. NMP has produced the following evidence in support of its contention that a genuine issue of material fact exists as to whether or not Parametric defrauded NMP as to Pro/E's capabilities: (1) in an internal memo from Mark Jones to Ernie McKee, Jones states that he was told by Bruce Sumpter, the local Parametric support representative, that it was possible that Pro/E was not going to work for NMP's particular application, *Exhibit 11, Appendix to Plaintiff's Response to Defendant's Motion for Summary Judgment*; (2) the Pro/E software never did perform for NMP despite numerous attempts and modifications implemented by NMP; and (3) Parametric's "solutions" to the various problems NMP was experiencing with the Pro/E software kept changing; thus Parametric's inability to properly diagnose the problem presents evidence that the software was incapable of performing as represented. NMP has also "clarified" its fraud claim to base the misrepresentation element on the fact that the demonstration purported to present fully detailed NMP *components* rather than a fully detailed switchboard.

According to Parametric, NMP has propounded yet another theory of misrepresentation based on the fact that Parametric allegedly misrepresented how the Pro/E software would perform on the Silicon Graphics machine. Parametric vigorously opposes NMP's attempts to "clarify" their fraud claim, asserting that under *Fed R. Civ. Pro.* 9(b), fraud claims must be pled with particularity, and that NMP's "clarification" is really an attempt to amend their Complaint. Parametric also opposes the alleged statement of Bruce Sumpter, contending that a statement in an internal memorandum constitutes double hearsay, and thus may not be considered by the Court. Even considering all of the various theories of misrepresentation as well as the hearsay evidence, the Court finds insufficient evidence of fraud.

The issue to be resolved here is if a question of fact exists as to whether the visual demonstration suggested that Pro/E could be implemented by NMP to create large, complex assemblies using a Silicon Graphics computer. Parametric has admitted that John Forbes told Marcus Jones that the Pro/E software would work on a Silicon Graphics computer. The parties do not dispute that a Silicon Graphics computer was used in the visual demonstration, and that the demonstration model created, altered, and produced a parts list for part of an NMP switchboard in a short amount of time. It is also uncontested that John Forbes did not recommend the Silicon Graphics hardware over any other choice, and in fact suggested that Jones experiment with a variety of hardware types before making a selection. The evidence indicates that no one at the demonstration thought to question whether the software and hardware would perform comparably when utilized in larger, more complex assemblies. It appears that the majority of NMP's unmet expectations with the Pro/E software involved functions that Parametric never represented Pro/E could perform, such as creating combined parts lists and creating automatic drawings (*Fagg Deposition, Exhibit 4, Plaintiff's Supplemental Response to Defendant's Motion for Summary Judgment*). Although Parametric arguably represented at the demonstration that a fully detailed component could be modified and updated quickly using the Pro/E software on a Silicon Graphics machine, this was a true representation since the Pro/E software and the Silicon Graphics hardware were successfully implemented by NMP for several months on smaller assemblies (*Fagg deposition, supra*). No one from Parametric ever stated that one of NMP's larger, more complex assemblies could be designed, modified, and updated at the same or similar rate of speed using the Silicon Graphics hardware.

Apparently NMP wanted Pro/E to perform highly complex tasks on the Silicon Graphics machine at a certain speed, but never questioned whether the software would perform at the same rate at which it did during the demonstration when utilized on larger assemblies. The evidence indicates that NMP knew that the demonstration was not a fully

detailed switchboard. Even if the demonstration did appear to be a fully detailed component, a fully detailed component is not the equivalent of a 1,000 to 20,000 part assembly. NMP seeks to hold Parametric responsible for NMP's failure to question how the software would perform when implemented to design or modify a more complex assembly; however, Parametric was not hired to select and design a computer system that would utilize the Pro/E software most effectively for NMP. They were merely the seller of a product. NMP has presented no evidence whereby a reasonable juror could find that Parametric made any misrepresentations regarding the capabilities of the Pro/E software.

For the foregoing reasons, the Defendant's Motion for Summary Judgment as to the Plaintiff's fraud and misrepresentation claim is GRANTED.

### III. *Gross Negligence*

■ Under Oklahoma law gross negligence is defined as the lack of slight care and diligence. Okla. Stat. tit. 25 § 6. The Oklahoma Supreme Court has expounded upon this statutory definition, stating that gross negligence requires the intentional failure to perform a manifest duty in reckless disregard of the consequences or in callous indifference to the life, liberty, or property of another. *Fox v. Oklahoma Memorial Hospital,* 774 P.2d 459, 461 (Okla.1989). Thus, gross negligence is the same as a negligence claim, differing only as to the degree.

NMP asserts that, as experts in the field of computer software, Parametric had a duty not to recommend software which could not meet NIP's needs. NMP further contends that Parametric breached this duty by recommending the Pro/E software, and that as a result of this breach NMP incurred economic injury through the expenditure of funds to purchase and implement the Pro/E software. Parametric claims that NMP's gross negligence claim is barred by the economic loss rule, which bars negligence actions seeking purely economic damages caused by a product defect; however NIP asserts that Oklahoma has not adopted the economic loss rule, citing *Keel v. Titan Constr. Corp.,* 639 P.2d 1228 (Okla.1982) and *Dentco Investment Co.,*

*Inc. v. Oklahoma Natural Gas Co.,* 569 P.2d 512 (Okla.App.1976).

■ The economic loss rule was recognized by the Supreme Court in *East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 871–72, 106 S.Ct. 2295, 2302–03, 90 L.Ed.2d 865 (1986). In *East River S.S. Corp.,* the Court, sitting in admiralty, determined that a products liability claim could not be pursued absent personal injury or property damage. *Id.* The Court reasoned that warranty law sufficiently protected the purchaser of a defective product for damages sustained to the product itself. *Id.* This decision was adopted by the Oklahoma Supreme Court in *Waggoner v. Town & Country Mobile Homes, Inc.,* 808 P.2d 649 (Okla. 1990). *See also, Oklahoma Gas & Elec. v. McGraw–Edison Co.,* 834 P.2d 980 (Okla. 1992). In *Waggoner,* the plaintiff sought recovery of purely economic damages caused by a defectively designed mobile home. Specifically, the Plaintiffs sought replacement costs of the home, and $50,000 in punitive damages for "misrepresentations ... suffering and harassment" resulting from failures of the manufacturer to remedy the defects. *Waggoner,* 808 P.2d at 651. The Court reversed a judgment for the plaintiffs on the ground that the trial court improperly instructed the jury on manufacturers' products liability. Holding that economic damages caused by a defective product were "more logically related to the UCC than to manufacturers' products liability" the court found that any recovery therefore must be based upon the contractual relationship, specifically the warranty provisions, express or implied. *Waggoner,* 808 P.2d at 653. The Court further stated that "[t]o extend manufacturers' product liability to include purely economic losses would undermine the UCC's 'comprehensive and finely tuned statutory mechanism for dealing with the rights of parties to a sales transaction with respect to economic losses.'" *Id. (citations omitted).* Parametric, although not citing the *Waggoner* case, urges the Court to apply the economic loss rule in this case, thus barring NMP's gross negligence claim. Parametric asserts that NMP's gross negligence claim is merely an attempt to recover monies expended on a

product that did not meet its expectations. Parametric further contends that NMP is limited to pursuit of a breach of warranty claim, and that NMP's allegation of gross negligence is an attempt to avoid the warranty limitations set forth in the Licencing Agreement. NMP counters by stating that Oklahoma has not adopted the economic loss rule, and that a party can recover under a negligence theory for purely economic losses. NMP cites *Keel v. Titan Constr. Corp.*, 639 P.2d 1228 (Okla.1982) and *Dentco Investment Co., Inc. v. Oklahoma Natural Gas Co.*, 569 P.2d 512 (Okla.App.1976) in support of its contention. The Court finds that *Keel* is not applicable to this issue because it dealt with performance of a contract for services rather than a sales contract; however, *Dentco Investment Co., Inc.* provides a more interesting and applicable analysis. In *Dentco Investment Co., Inc.*, Oklahoma Natural Gas Company ("ONG"), approached the defendant, who was planning the construction of an apartment complex, and fraudulently induced it to purchase a natural gas air conditioning system for use in the new apartments. *Dentco Investment Co., Inc.*, 569 P.2d at 514. ONG drew up the plans for the system, including designing the duct work layout and specifications as to the number, location, type and tonnage of the chiller units and coil sizes. *Id.* at 515. ONG then hired a company to supply and install the units. *Id.* The system did not work properly from the start, and major modifications failed to correct the problem. *Id.* at 516. The plaintiffs sued ONG, seeking recovery on theories of negligence, fraud and misrepresentation, breach of contract, and the Oklahoma Deceptive Trade Practices Act. The court allowed negligence claims to be pursued against ONG; however, the court specifically found that ONG "did undertake to design an air-conditioning system for plaintiffs'," and in so doing, "incurred legal responsibility for 'injury occasioned ... by [its] want of ordinary care or skill....'" *Id. (citations omitted).* The *Dentco Investment Co., Inc.* case, although more closely resembling the facts in this dispute, is clearly distinguishable. In this case, there is no evidence that Parametric contracted with NMP to design a computer system capable of meeting NMP's

needs. The dispute involves a sales contract, and any system design was left specifically to NMP's discretion. Whether Oklahoma courts would apply the economic loss rule to this dispute or not, NMP cannot pursue a gross negligence claim against Parametric because there is no duty imposed on Parametric outside the scope of the Licensing Agreement and the warranties contained therein. *Compare, Walter Raczynski Prod. Design v. International Business Machines Corp.*, 1994 WL 247130, *2 (N.D.Ill.1994) (holding that a provider of software and hardware was not an information provider and thus could not be charged with negligent misrepresentation); *Hoke, Inc. v. Cullinet Software, Inc.*, 1992 WL 102715 (D.N.J.1992) (holding that New Jersey courts would bar tort suits for negligent misrepresentations inducing the formation of contracts between commercial parties); *Accusystems, Inc. v. Honeywell Information Systems, Inc.*, 580 F.Supp. 474 (S.D.N.Y.1984) (rejecting negligent misrepresentation claim against seller of computer hardware and software on the ground that New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties). *But see, Schroders, Inc. v. Hogan Systems, Inc.*, 137 Misc.2d 738, 522 N.Y.S.2d 404 (1987) (permitting a cause of action for negligent misrepresentation against seller of software despite lack of special relationship because "this cause of action has been held to exist as between parties to contracts").

For the foregoing reasons, Defendant's Motion for Summary Judgment as to Plaintiff's gross negligence claim is GRANTED.

### IV. *Breach of Contract*

NMP's remaining claim is a breach of contract claim alleging that the Pro/E software was defective, and violated the warranty clause contained in the Licensing Agreement. NMP seeks recovery of the purchase price of the Pro/E software as well as the costs incurred to implement the software including the cost of purchasing the Silicon Graphics hardware.

Parametric seeks summary judgment on the ground that NMP's breach of contract claim is time barred. Alternatively, Parame-

tric asserts that if the breach of contract claim is not time barred, Parametric's liability is limited to the actual amount that NMP paid to Parametric.

Under the Licensing Agreement, Parametric warrants that the licensed program, at the time of installation and for 90 days afterward, will conform substantially to the applicable documentation delivered by Parametric. The Licensing Agreement further states that Parametric will provide customer service and new releases of the licensed program during the warranty period. The customer service agreement indicates that, upon receiving written notice from the customer specifying failures or errors found in a program during the warranty period, Parametric will use its best efforts to correct significant programming errors and to repair or replace licensed products not conforming to the applicable documentation. Upon payment of an additional maintenance fee, a customer may extend this maintenance plan. The Licensing Agreement clearly and unambiguously disclaims all other warranties, express or implied, including any warranty of merchantability or fitness for a particular purpose.

NMP asserts that the licensing of software does not constitute a sale of goods, and since Oklahoma public policy prohibits contractual limitations periods for contracts falling outside the scope of Article 2 of the UCC, the Massachusetts six year limitations period applies. Alternatively, NMP states that even if the one year limitation period is applicable, the breach of warranty claim accrues upon discovery of the breach, since the Licensing Agreement warranty extends to future performance of the goods. NMP further states that genuine issues of material fact exist as to whether NMP knew or should have known of such claims prior to February 16, 1995, and cites Mass. Gen. Laws ch. 106, § 275(2), and *Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir.1993) in support of this contention.

■ Since the Court has already determined that the licensing of the Pro/E software in this case constituted a sale of goods, the first issue to be resolved is whether Massachusetts law allows parties to a con-

tract for a sale of goods to contractually limit damages, and provide limitations periods on initiation of contractual claims. Under Massachusetts law, a contractual one year limitations period does not violate Massachusetts public policy, and is expressly permitted under the Massachusetts UCC. Mass. Gen. Law ch. 106 § 2–725; *Hays v. Mobil Oil Corp.*, 930 F.2d 96, 100 (1st Cir.1991). Similarly, the Massachusetts UCC allows parties to a contract for the sale of goods to limit damages as long as such limitation would not be unconscionable. Mass. Gen. Law ch. 106 § 2–719. See also, *PC COM, Inc. v. Proteon, Inc.*, 946 F.Supp. 1125, 1138 (S.D.N.Y.1996) (holding that under Massachusetts law, contractual provision in computer goods sales contract limiting consequential damages was not unconscionable). Similarly, Massachusetts law permits parties to modify or limit express or implied warranties as long as the language is conspicuous, and in the case of limitations of implied warrants of merchantability, as long as the limitation clause mentions the word "merchantability". Mass. Gen. Law ch. 106 § 2–316. The Court finds that the contractual provisions in the Licensing Agreement are valid under Massachusetts law, therefore the only remaining issue is whether the breach of contract claim accrued prior to February 16, 1995.

■ The parties agree that the 90–day warranty contained in the Licensing Agreement is a warranty for future performance, that the Licensing Agreement disclaims all other warranties, and that the software performed without problem for the 90 day period following installation. The parties dispute, however, when the claim for breach of warranty should accrue. According to Parametric, the cause of action accrued within the 90 day limited warranty period, and since no defects were discovered within that 90 day period, a breach of warranty claim is time barred. NMP asserts that the proper accrual test is the "discovery rule", and that the breach of warranty cause of action accrued when NIP knew or should have known in the exercise of reasonable diligence that the Pro/E software was defective. NMP further states that a genuine issue of fact exists as to

whether NMP knew or should have known about the breach prior to February 16, 1995.

The only Massachusetts case on point is the *Cambridge Plating Co., Inc.* case cited by NMP in support of their contention that the discovery rule applies to warranties of future performance. *Cambridge Plating Co., Inc.*, 991 F.2d at 25–26 ("a cause of action for breach of a warranty of future performance is tolled until the plaintiff has adequate notice of the claim"). This is a well established rule in commercial contracts and has been reduced to writing in § 2–725 of the Uniform Commercial Code. *See*, Mass. Gen. Law ch. 106 § 2–725 ("A breach of warranty accrues when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."). Thus, if, as the parties stipulate, the warranty in the Licensing Agreement is a warranty of future performance, the *Cambridge Plating Co., Inc.* case is dispositive of the accrual issue. Although Parametric correctly points out that the warranty provision in the *Cambridge Plating Co., Inc.* contract was not time limited, but rather appeared to extend indefinitely, *Cambridge Plating Co., Inc. v. NAPCO, Inc.*, 876 F.Supp. 326, 331 (D.Mass.1995), this does not change the Massachusetts rule of law that warranties of future performance accrue when the breach is or should have been discovered. Parametric contends that the warranty of future performance only covered future performance within 90 days from the time of installation. NMP asserts that the warranty extended each time the maintenance plan was renewed. The Court finds, however, that warranties of future performance must be explicit. Warranties that appear to promise future performance may be nothing more than promises to repair defects occurring within a specific time frame.

Consider the case in which the manufacturer promises to repair any defect in a car's drivetrain that occurs within two years or 24,000 miles, whichever occurs first.... Many courts would interpret this as a warranty that explicitly extends to future performance and would therefore grant four years from the time of the occurrence of the defect. On the other hand, one might read the agreement to mean simply that the seller will repair any defect that comes to light within that period irrespective of its cause, by that seller's liability ends at the earlier 24,000 miles and does not extend for four years beyond that time. The seller (and buyer if the truth be known) may construe such agreement not as a warranty at all but as an agreement to repair unrelated to any defect in the goods ...

James J. White & Robert S. Summers, *Uniform Commercial Code* § 11–9 at 479 (3d ed.1988). This passage perfectly illustrates the conflicting interpretation presented in this case. The warranty in the present case states that the Pro/E program will conform substantially to the applicable documentation supplied to the customer; however, the Licensing Agreement further states that Parametric's obligations under the warranty are limited to using its best efforts to correct all significant programming errors, and to repair or replace all products not performing substantially in accordance with the applicable documentation at no expense to the customer. Although the Licensing Agreement does allow NMP to purchase a maintenance plan at the expiration of the warranty period, the maintenance plan is clearly a separate agreement to provide maintenance services for a annual fee. "The Maintenance Plan shall be renewable annually after the initial 90 day Warranty period, and Customer shall pay therefor in advance according to the then current Maintenance Fee ..." *(Appendix to Plaintiff's Response, Exhibit 2 ¶ 8).*

The Court finds that the 90 day warranty covers defects which appear within the 90 day period following installation. Since no defects appeared in the software prior to that date, NMP's breach of warranty claim is time barred. *See, Office Supply Co., Inc. v. Basic/Four Corp.*, 538 F.Supp. 776 (.D.Wis. 1982) (upholding 90–day warranty limitation and granting summary judgment on breach of contract claim where defects in computer system arose outside of warranty period); *Dreier Co., Inc. v. Unitronix Corp.*, 218 N.J.Super. 260, 527 A.2d 875 (1986) (holding

that warranty claim accrued at tender where 180 day warranty on computer not a warranty for future performance as it involved a remedy only); *Liecar Liquors, Ltd. v. CRS Business Computers, Inc.,* 205 A.D.2d 868, 613 N.Y.S.2d 298 (3d Dept.1994) (time limited warranty on computer not a warranty for future performance as it involved a remedy only).

For the foregoing reasons, Parametric's Motion for Summary Judgment is GRANTED as to NMP's breach of contract claim.

### Conclusion

The Court has determined that Defendant Parametric is entitled to summary judgment as to all claims in this matter. As to NMP's fraud and misrepresentation claim, NMP has failed to provide evidence that any misrepresentations were made to NMP by Parametric. NMP's gross negligence claim fails because Parametric owed no duty to NMP, and thus could not have breached such duty. NMP's breach of contract claim is time barred pursuant to the warranty and limitations provisions contained in the Licensing Agreement. For the foregoing reasons, Parametric's Motion for Summary Judgment (docket # 9) is GRANTED.